1   XAVIER BECERRA
    Attorney General of California
2   PAUL STEIN
    Supervising Deputy Attorney General
3   NATASHA SAGGAR SHETH
    Deputy Attorney General
4   State Bar No. 282896
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone: (415) 510-3818
6    Fax:  (415) 703-5480
     E-mail:  Natasha.Sheth@doj.ca.gov
7   *Attorneys for Governor Gavin Newsom and
    Sonia Y. Angell, in their official capacities*

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11

12   **ASHTON FORBES,**                    3:20-cv-00998-BAS-JLB

13                        Plaintiff,       **STATE DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN**

14        **v.**                           **SUPPORT OF MOTION TO DISMISS SECOND AMENDED**

15   **COUNTY OF SAN DIEGO,**              **COMPLAINT**
     **GOVERNOR GAVIN NEWSOM in**
16   **his official capacity, SONIA Y.**   Judge:      Hon. Cynthia A. Bashant
     **ANGELL, in her official capacity,** Courtoom:  4B
17   **and DOES 1-50,**

18                        Defendants.      Hearing Date : Tuesday, Sept. 8, 2020

19

20

21

22

23

24

25

26

27

28

1

# REQUEST FOR JUDICIAL NOTICE

Defendants Governor Gavin Newsom, and State Public Health Officer and Director of the California Department of Public Health Sonia Angell ("State Defendants") respectfully request that the Court take judicial notice of the public records and facts identified below, which are not subject to reasonable dispute, or otherwise are evidence of information generally in the public realm and properly subject to judicial notice under Federal Rule of Evidence 201.

A fact is judicially noticeable when it is not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Judicial notice is mandatory if "a party requests it" and the court is "supplied with the necessary information." Fed. R. Evid. 201(c)(2).

This Court may take judicial notice of matters of "government documents, court filings, press releases, and undisputed matters of public record," including court filings and orders from other cases. *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 n.5 (9th Cir. 2018). This includes state executive orders and other directives. *See*, *e.g.*, *Givens v. Newsom*, No. 2:20-cv-00852-JAM-CKD, ___ F. Supp. 3d___, 2020 WL 2307224, *2 (E.D. Cal. May 8, 2020), *appeal docketed* No. 20-15949 (9th Cir. May 19, 2020); *Cross Culture Christian Ctr. v. Newsom*, ___ F. Supp. 3d ___, 2020 WL 2121111, at *2 (E.D. Cal, May 5, 2020), *appeal docketed* No. 20-15977 (9th Cir. May 20, 2020).

Courts may also take judicial notice of "government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014), aff'd sub nom. *United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017); see also *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir.

2010); *George v. Diaz,* No. 20-CV-03244-SI, 2020 WL 2542020, at *2 (N.D. Cal. May 19, 2020).

Courts may also judicially notice documents such as websites and newspaper articles, not for the truth of their contents, but to take notice of what information was in the public realm at the time. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *Prime Healthcare Servs., Inc. v. Humana Ins. Co.*, 230 F. Supp. 3d 1194, 1201 (C.D. Cal. 2017); *Heliotrope Gen. Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.118 (9th Cir. 1999).

Based on the foregoing, the State Defendants respectfully request that this Court take judicial notice of the following documents:

1. **Exhibit 1**: A true and correct copy of the California Department of Public Health website, *COVID-19 by the Numbers*, reporting 391,538 cases of COVID-19 in California, and 7,694 fatalities, as of July 20, 2020. This information is also available at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (last accessed July 21, 2020).

2. **Exhibit 2**: A true and correct copy of the Centers for Disease Control and Prevention (CDC) website, *Cases in the U.S.*, reporting 3.8 million cases in the United State, and 140,630 fatalities, as of July 21, 2020. This information is also available at: https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed July 21, 2020).

3. **Exhibit 3**: A true and correct copy of the California Department of Public Health July 13, 2020 Statewide Public Health Officer Order, also available at: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf (last accessed July 21, 2020).

4. **Exhibit 4**: A true and correct copy of the April 3, 2020 NPR News Article by Colin Dwyer and Allison Aubrey, *CDC Now Recommends Americans Consider*

2

*Wearing Cloth Face Coverings in Public*, also available at:

https://www.npr.org/sections/coronavirus-live-updates/2020/04/03/826219824/president-trump-says-cdc-now-recommends-americans-wear-cloth-masks-in-public (last accessed July 21, 2020).

5.   **Exhibit 5**:  A true and correct copy of a June 24, 2020 press release by the Institute for Health Metrics and Evaluation, *New IHME COVID-19 Model Projects Nearly 180,000 US Deaths*, predicting the avoidance of over 2,800 fatalities in California by October 1, 2020 if at least 95% of people statewide wear masks in public.  This document is also available at: http://www.healthdata.org/news-release/new-ihme-covid-19-model-projects-nearly-180000-us-deaths (last accessed July 21, 2020).

6.   **Exhibit 6**:  A true and correct copy of the CDC's June 12, 2020 Morbidity and Mortality Weekly Report (MMWR), *SARS-CoV-2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members — USS Theodore Roosevelt, April 2020*, concluding that young, healthy adults with COVID-19 might have mild or no symptoms, therefore use of face coverings and other preventive measures could mitigate transmission.  This document is also available at: https://www.cdc.gov/mmwr/volumes/69/wr/mm6923e4.htm#suggestedcitation (last accessed July 21, 2020).

7.   **Exhibit 7**:  A true and correct copy of the CDC's July 14, 2020 Morbidity and Mortality Weekly Report (MMWR), *Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri, May 2020*, concluding that broader implementation of face covering policies could mitigate the spread of infection in the general population.  This document is also available at: https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e2.htm?s_cid=mm6928e2_w (last accessed July 21, 2020).

8.   **Exhibit 8**:  A true and correct copy of the July 14, 2020 CDC Press Release, *CDC Calls on Americans to Wear Masks to Prevent COVID-19 Spread*, available at: https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html (last accessed July 21, 2020).

9.   **Exhibit 9**:  A true and correct copy of a Goldman Sachs analysis, *Face Masks and GDP*, concluding that the national economy "could benefit significantly" from a national face mask mandate.  This document is also available at: https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html (last accessed July 21, 2020).

10. **Exhibit 10**:  A true and correct copy of the June 30, 2020 Forbes magazine article by Sarah Hansen, *A National Mask Mandate Could Save The U.S. Economy $1 Trillion, Goldman Sachs Says*, explaining that an analysis by Goldman Sachs determined that a national mandate requiring the face coverings would salvage roughly $1 trillion of economic activity.  This document is also available at: https://www.forbes.com/sites/sarahhansen/2020/06/30/a-national-mask-mandate-could-save-the-us-economy-1-trillion-goldman-sachs-says/#7df9620c56f1 /, (last accessed July 21, 2020).

11. **Exhibit 11**:  A true and correct copy of the June 18, 2020 press release issued by the California Department of Public Health regarding the new requirements for face coverings in public settings.  This document is also available at: https://www.cdph.ca.gov/Programs/OPA/Pages/NR20-128.aspx (last accessed July 21, 2020).

12. **Exhibit 12**:  A true and correct copy of the Honorable Jesus G. Bernal's Order Denying Plaintiff's Emergency Application for Temporary Restraining Order in *PCG-SP Venture I LLC v. Newsom, et al.*, No. 5:20-cv-01138-JGB-KK, ECF No. 22 at 7 (C.D. Cal. June 23, 2020).

1    The State Defendants have furnished the Court with sufficient information to

2  enable it to take judicial notice, and the attached records are judicially noticeable

3  for the reasons stated above.  Therefore, judicial notice is appropriate.  Fed. R.

4  Evid. 201(c)(2).

5

6  Dated:  July 21, 2020                         Respectfully submitted,

7                                                XAVIER BECERRA
                                                 Attorney General of California
8                                                PAUL STEIN
                                                 Supervising Deputy Attorney General
9

10

11                                                /s/ *Natasha Saggar Sheth*
                                                 NATASHA SAGGAR SHETH
12                                                Deputy Attorney General
                                                 *Attorneys for Defendants*
13

14  SA2020302047
    42276311.docx

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDEX OF EXHIBITS

| Exhibit No. | Document Name | Page No. |
|---|---|---|
| 1 | California Department of Public Health website, *COVID-19 by the Numbers* | 001-002 |
| 2 | Centers for Disease Control and Prevention (CDC) website, *Cases in the U.S.* | 003 |
| 3 | California Department of Public Health July 13, 2020 Statewide Public Health Officer Order | 004-008 |
| 4 | April 3, 2020 NPR News Article by Colin Dwyer and Allison Aubrey, *CDC Now Recommends Americans Consider Wearing Cloth Face Coverings in Public* | 009-012 |
| 5 | June 24, 2020 press release by the Institute for Health Metrics and Evaluation, *New IHME COVID-19 Model Projects Nearly 180,000 US Deaths* | 013-015 |
| 6 | CDC's June 12, 2020 Morbidity and Mortality Weekly Report (MMWR), *SARS-CoV-2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members — USS Theodore Roosevelt, April 2020* | 016-023 |
| 7 | CDC's July 14, 2020 Morbidity and Mortality Weekly Report (MMWR), *Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri, May 2020* | 024-031 |

| 8 | July 14, 2020 CDC Press Release, *CDC Calls on Americans to Wear Masks to Prevent COVID-19 Spread* | 032-033 |
|---|---|---|
| 9 | Goldman Sachs analysis, Face Masks and GDP | 034-043 |
| 10 | June 30, 2020 Forbes magazine article by Sarah Hansen, *A National Mask Mandate Could Save The U.S. Economy $1 Trillion, Goldman Sachs Says* | 044-046 |
| 11 | June 18, 2020 press release issued by the California Department of Public Health regarding the new requirements for face coverings in public settings | 047-049 |
| 12 | Honorable Jesus G. Bernal's Order Denying Plaintiff's Emergency Application for Temporary Restraining Order in *PCG-SP Venture I LLC v. Newsom, et al.* | 050-066 |

Exhibit 1

**California Department of Public Health**

Visit CDPH News Releases for daily COVID-19 updates.

En Español: Para obtener información en español, visite nuestra página de COVID-19.

**Alerts**

**Order of the State Public Health Officer (PDF) – July 13, 2020**

**Order of the State Public Health Officer (PDF) – May 7, 2020**

**Stay Home Except for Essential Needs FAQs – March 20, 2020**

**COVID-19 by the Numbers**

On July 20, California reported 6,846 new cases of COVID-19. The state now has a total of 391,538 positive cases. There have been a total of 7,694 deaths in the state.

# California COVID-19 By The Numbers

## July 20, 2020

### Numbers as of July 19, 2020

## CALIFORNIA COVID-19 SPREAD

## 391,538 (+6,846)

### TOTAL CASES

### Ages of Confirmed Cases
- 0-17: 33,630
- 18-49: 235,513
- 50-64: 76,179
- 65+: 45,759
- Unknown/Missing: 457

### Gender of Confirmed Cases
- Female: 194,690
- Male: 194,780
- Unknown/Missing: 2,068

## 7,694 (+9)
### Fatalities

### Hospitalizations

**Confirmed COVID-19**
## 6,921/1,943
Hospitalized/in ICU

**Suspected COVID-19**
## 1,498/214
Hospitalized/in ICU

### For county-level hospital data:
### bit.ly/hospitalsca

### Your actions save lives.

### For county-level data:
### data.chhs.ca.gov
### covid19.ca.gov




For county level data, access the COVID-19 Public Dashboard.

For skilled nursing facility data, visit Skilled Nursing Facilities COVID-19.

For age group data, visit Cases and Deaths Associated with COVID-19 by Age Group in California

**Racial Demographics - A More Complete Picture**

The California Department of Public Health is committed to health equity and collecting more detailed racial and ethnic data that will provide additional understanding for determining future action. Health outcomes are affected by forces including structural racism, poverty and the disproportionate prevalence of underlying conditions such as asthma and heart disease among Latinos and African American Californians. Only by looking at the full picture can we understand how to ensure the best outcomes for all Californians.

The differences in health outcomes related to COVID-19 are most stark in COVID-19 deaths. We have nearly complete data on race and ethnicity for COVID-19 deaths, and we are seeing the following trends: Latinos, African Americans and Native Hawaiians and Pacific Islanders are dying at disproportionately higher levels. More males are dying from COVID-19 than females, in line with national trends.

For the additional information, visit COVID-19 Race and Ethnicity Data.

Testing in California

Twenty-five public health labs in California are testing samples for COVID-19. These labs include the California Department of Public Health's Laboratory in Richmond, Alameda, Butte, Contra Costa, Fresno, Humboldt, Imperial, Long Beach, Los Angeles, Monterey, Napa-Solano-Yolo-Marin (located in Solano), Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, San Joaquin, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sonoma, Tulare and Ventura County public health laboratories. The Richmond Laboratory will provide diagnostic testing within a 48-hour turnaround time. This means California public health officials will get test results sooner, so that patients will get the best care. Additional information on testing and locations to get tested in California can be found on the Testing and Treatment page.



**Protect Yourself**

How can people protect themselves?

There is currently no vaccine to prevent COVID-19. The best way to prevent illness is to avoid being exposed to this virus. The virus spreads mainly from person-to-person between people who are in close contact with one another (within about 6 feet). This occurs by respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs. Surfaces can also get infected. Older adults and people who have severe underlying medical conditions like hypertension, obesity, heart or lung disease , diabetes or asthma seem to be at higher risk for developing more serious complications from COVID-19 illness. Every person has a role to play. So much of protecting yourself and your family comes down to common sense:

- Stay home except for essential needs/activities.
- Practice physical distancing – stay 6 feet away from people.
- Wear a cloth face mask if you leave home.
- Wash hands with soap and water for at least 20 seconds.
- Clean and disinfect frequently touched surfaces daily. If surfaces are dirty, clean them using detergent or soap and water prior to disinfection.
- Avoid touching eyes, nose or mouth.
- Cover your cough or sneeze with a tissue or your elbow or a tissue. Wash hands afterwards.
- Avoiding close contact with people who are sick.
- Stay home and away from people if you become sick with respiratory symptoms like fever and cough.
- If you smoke or vape, consider quitting. Smoking and vaping causes harm to the lungs.
- Follow guidance from public health officials.

Please consult with your health care provider about additional steps you may be able to take to protect yourself.

Exhibit 1
001

**Who is at Higher Risk for Serious Illness from COVID-19?**

Early information out of China, where COVID-19 first started, shows that some people are at higher risk of getting very sick from this illness. This includes:

- Smokers
- Older adults (65+)
- Individuals with compromised immune systems
- Individuals who have serious chronic medical conditions like:
  - Heart disease
  - Diabetes
  - Lung disease

If you are at higher risk for serious illness from COVID-19 because of your age or health condition, it is important for you to take extra actions to reduce your risk of getting sick with the disease.

- Stay home. It's the most important thing you can do.
- Avoid contact with people who are sick. Isolate anyone sick in your home in a separate room, if possible.
- Consider ways of getting food brought to your house through family, social, or commercial networks. Wipe off containers with disinfectant wipes.

It is also important that you listen to public health officials who may recommend community actions to reduce potential exposure to COVID-19, especially if COVID-19 is spreading in your community.

For more information see the CDC's website.

## What if I'm sick?

**What are the symptoms of COVID-19?**

Typically, human coronaviruses cause mild-to-moderate respiratory illness. Symptoms are wide ranging and can be similar to the flu, including:

- Fever
- Cough
- Shortness of breath
- Chills
- Repeated shaking with chills
- Muscle pain
- Headache
- Sore Throat
- New loss of taste or smell

COVID-19 can cause more severe respiratory illness. If you have any of the emergency warning signs listed below, you should contact your medical provider immediately:

- Trouble breathing
- Persistent pain or pressure in the chest
- New confusion
- Bluish lips or face

**What if I have symptoms?**

Patient: If a person develops symptoms of COVID-19, including fever, cough or shortness of breath, and has reason to believe they may have been exposed, they should call their health care provider before seeking care. Contacting them in advance will make sure that people can get the care they need without putting others at risk. Please be sure to tell your health care provider about your travel history. You can also take the following precautionary measures: avoid contact with sick individuals, wash hands often with soap and warm water for at least 20 seconds.

Health Care Provider: Patients who may have infection with this novel coronavirus should wear a surgical mask and be placed in an airborne infection isolation room. If an airborne infection isolation room is not available, the patient should be placed in a private room with the door closed. Health care providers should use standard, contact and airborne precautions and use eye protection. Please see "Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (2019-nCoV) in Wuhan, China" for more information about infection control. The Public Health Department will issue All Facility Letters to regulated healthcare facilities within California with updated information and guidance; these can be found on the AFL webpage.

**What should you do if you think you're sick?**

Call ahead: If you are experiencing symptoms of COVID-19 and may have had contact with a person with COVID-19, or recently traveled to countries with apparent community spread, call your health care provider before seeking medical care so that appropriate precautions can be taken.

Necesito Hacerme La Prueba Del Covid-19? (PNG)



## Getting Care

**What is the treatment for COVID-19?**

From the international data we have, of those who have tested positive for COVID-19, approximately 80 percent do not exhibit symptoms that would require hospitalization. For patients who are more severely ill, hospitals can provide supportive care. We are continuing to learn more about this novel coronavirus and treatment may change over time.

**What if I don't have health insurance and need screening or treatment for COVID-19?**

- Check with your local community health center or hospital to see if fees for testing can be waived
- See if you're eligible for Medi-Cal
- See if you're eligible for Covered California

**How is it decided whether a person with a confirmed case of COVID-19 can self-isolate at home or must be confined to a hospital or elsewhere?**

Local health departments are working in partnership with the California Department of Public Health and the CDC, and making determinations on whether a person ill with COVID-19 requires hospitalization or if home isolation is appropriate. That decision may be based on multiple factors including severity of illness, need for testing, and appropriateness of home for isolation purposes.

## Protecting Others

**What is Social Distancing?**

Social distancing is a practice recommended by public health officials to stop or slow down the spread of contagious diseases. It requires the creation of physical space between individuals who may spread certain infectious diseases. The key is to minimize the number of gatherings as much as possible and to achieve space between individuals when events or activities cannot be modified, postponed, or canceled. Achieving space between individuals of approximately six feet is advisable. Additionally, there is a particular focus on creating space between individuals who have come together on a one-time or rare basis and who have very different travel patterns such as those coming from multiple countries, states or counties.

For more information, see the Gathering Guidance (PDF).

**Should I wear a mask?**

California's public health officials released updated guidance on June 18 on the use of cloth face coverings by the general public worn outside the home. It mandates that face coverings be worn state-wide in the circumstances and with the exceptions outlined in the guidance. It does not substitute for existing guidance about social distancing and handwashing.

The use of cloth face coverings could reduce the transmission of COVID-19 by individuals who do not have symptoms and may reinforce physical distancing. Public health officials also caution that face coverings may increase risk if users reduce their use of strong defenses such as physical distancing and frequent hand washing.

Please see the updated guidance (PDF) for more information.

**What is the state doing to protect our health?**

California has been actively and extensively planning with our local public health and health care delivery systems.

Here are some of the actions California is taking to combat COVID-19:

- Directed Californians to stay at home to slow the spread of the virus
- Made testing free for most Californians who are medically eligible for testing
- Ensured students continue to learn and get meals even when schools physically close
- Deployed the California National Guard to work at food banks
- Distributed millions of N95 masks and other protective gear to health care workers, with more to come soon
- Secured travel trailers and hotels to house people experiencing homelessness

## Travel

**Can I travel?**

You can travel for urgent matters or if such travel is essential to your permitted work. Even though businesses around the state are opening up, avoid travelling long distances for vacations or pleasure as much as possible. This is to slow the spread of the coronavirus. Do not travel if you are sick, or if someone in your household has had coronavirus in the last two weeks. Do not travel with someone who is sick.

Before travelling away from your community, consider these questions from the Center for Disease Control (CDC) travel guidance:

- Is coronavirus spreading where you are traveling?
- Are you or those you are traveling with more likely to get very sick from coronavirus?
- Will you be able to keep 6 feet of physical distance from others during or after your trip?

If you do travel, take steps to keep everyone safe like wearing a face covering, keeping 6 feet of physical distance from those not in your household, and washing your hands frequently.

More info: Stay home Q&A

**What should I do if I am unable to work after being exposed to COVID-19?**

Individuals who are unable to work due to having or being exposed to COVID-19 (certified by a medical professional) can file a Disability Insurance (DI) claim.

Disability Insurance provides short-term benefit payments to eligible workers who have full or partial loss of wages due to a non-work-related illness, injury, or pregnancy. Benefit amounts are approximately 60-70 percent of wages (depending on income) and range from $50 - $1,300 a week.

Californians who are unable to work because they are caring for an ill or quarantined family member with COVID-19 (certified by a medical professional) can file a Paid Family Leave (PFL) claim.

Paid Family Leave provides up to six weeks of benefit payments to eligible workers who have a full or partial loss of wages because they need time off work to care for a seriously ill family member or to bond with a new child. Benefit amounts are approximately 60-70 percent of wages (depending on income) and range from $50-$1,300 a week.

For more information related to resources for California's Employers and Workers, please visit this Labor and Workforce Development Agency webpage.

What is the difference between COVID-19 and other coronaviruses?

Coronaviruses are a large family of viruses. There are some coronaviruses that commonly circulate in humans. These viruses cause mild to moderate respiratory illness, although rarely they can cause severe disease. COVID-19 is closely related to two other animal coronaviruses that have caused outbreaks in people—the SARS coronavirus and the MERS (middle east respiratory syndrome) coronavirus.

**Guidance and Information**

Public: COVID-19 General Information Line - Public Questions and Resources: 1-833-4CA4ALL (1-833-422-4255) Monday - Friday 8 a.m. to 8 p.m. PDT and Sat/Sun 8 a.m. to 5 p.m. PDT

Media: If you are with a media outlet and have questions for the California Department of Public Health, please email CDPHPressOPA@cdph.ca.gov.

Exhibit 1
002

Exhibit 2

# Coronavirus Disease 2019 (COVID–19)

# Cases in the U.S.

Updated July 21, 2020

Print

| TOTAL CASES | TOTAL DEATHS |
|---|---|
| **3,819,139** | **140,630** |
| 57,777 New Cases* | 473 New Deaths* |



**Want More Data?**
CDC COVID Data Tracker

## Cases by Jurisdiction

This map shows COVID-19 cases reported by U.S. states, the District of Columbia, New York City, and other U.S.-affiliated jurisdictions. Hover over the maps to see the number of cases reported in each jurisdiction. To go to a jurisdiction's health department website, click on the jurisdiction on the map.



This map shows COVID-19 cases reported by U.S. states, the District of Columbia, New York City, and other U.S.-affiliated

Exhibit 2
003

Exhibit 3



State of California—Health and Human Services Agency
# California Department of Public Health



**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

**GAVIN NEWSOM**
*Governor*

## Statewide Public Health Officer Order,
## July 13, 2020

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Resilience Roadmap. On May 7th, I announced that statewide data supported the gradual movement of the entire state into Stage 2 of the Pandemic Resilience Roadmap. On May 8th, the Governor outlined a process where counties that met specific criteria could move more quickly than other parts of the state through Stage 2 of modifying the Stay-at-Home order, including certain businesses deemed higher risk.

The statewide data has since demonstrated a significant increase in the spread of COVID-19, resulting in public health conditions that demand measures responsive to those conditions be put into place with haste. On June 28, 2020, the California Department of Public Health (CDPH) issued guidance setting forth the need to close bars and similar establishments in counties that – due to concerning levels of disease transmission, hospitalizations, or insufficient testing – had been on the County Monitoring List, which includes counties that show concerning levels of disease transmission, hospitalizations, insufficient testing, or other critical epidemiological markers, for 14 days. On July 1, 2020, CDPH issued guidance specific to counties on the County Monitoring List for three consecutive days, requiring closure of the indoor operations of various sectors, including restaurants, wineries, and certain entertainment venues, as well as all bars indoor and outdoor. Based on my judgment as the State Public Health Officer, it is now necessary to take these steps statewide, to take additional steps for counties on the County Monitoring List, and to continue to monitor and modify the process of reopening.

The current data reflect that community spread of infection is of increasing concern across the state. On July 1, 2020, there were 19 counties on the County Monitoring List. As of July 13, 2020, there are 32 counties on the list, and additional counties may soon be added as data warrants. In addition to the impact on the general population, community spread increases the likelihood of expanded transmission of COVID-19 in congregate settings such as nursing homes, homeless shelters, jails and prisons. Infection of these vulnerable populations in these settings can be catastrophic. Higher



levels of community spread also increase the likelihood of infection among individuals at high risk of serious outcomes from COVID-19, including the elderly and those with underlying health conditions who might live or otherwise interact with an infected individual.

The Pandemic Resilience Roadmap classifies bars, pubs, breweries, brewpubs, dine-in restaurants, wineries and tasting rooms, family entertainment centers, zoos, museums, and cardrooms as Stage 2 or Stage 3 sectors with high risk of transmission due to a number of features of the businesses and the behaviors that occur within them. Public health studies have shown that the risk of transmission is exacerbated in indoor spaces, particularly when lacking appropriate ventilation. These sectors are settings where groups convene and may mix with others for a prolonged period of time, increasing the risk of escalating the transmission rate of COVID-19. While physical distancing is critical to mitigating exposure, it is more effective at protecting an individual with brief exposures or outdoor exposures. In contrast to indoor spaces, wind and the viral dilution in outdoor spaces can help reduce viral load.

Bars, both indoor and outdoor, have additional risk factors. A bar, foundationally, is a social setting where typically not only small groups convene, but also where groups mix with other groups.  Bars also have an added risk imposed by the consumption of alcohol as a primary activity offered in such venues. Alcohol consumption slows brain activity, reduces inhibition, and impairs judgment, factors which contribute to reduced compliance with recommended core personal protective measures, such as the mandatory use of face coverings and maintaining six feet of distance from people in different households, both indoors and outdoors. Louder environments and the cacophony of conversation that are typical in bar settings also require raised voices and greater projection of orally emitted viral droplets.

For counties on the County Monitoring List, the risks and impacts of disease transmission are even greater. The science suggests that for indoor operations the odds of an infected person transmitting the virus are dramatically higher compared to an open-air environment. Thus, for those counties on the list, it is necessary to close indoor operations for additional sectors which promote the closed-space mixing of populations beyond households and/or make adherence to physical distancing with face coverings difficult, including: gyms and  fitness centers, places of worship, protests, offices for non-Critical Infrastructure sectors as designated on covid19.ca.gov, personal care services (including nail salons, massage parlors, and tattoo parlors), hair salons and barbershops, and malls.

Exhibit 3
005

**NOW, THEREFORE, I, as State Public Health Officer and Director of the California Department of Public Health, order all of the following:**

**Statewide Order Relative to Bars, Pubs, Brewpubs, and Breweries**

1. Bars, pubs, brewpubs, and breweries, whether operating indoors or outdoors, shall be closed across the state, unless an exception below applies.

  a. Bars, pubs, brewpubs, and breweries, may operate outdoors if they are offering sit-down, outdoor, dine-in meals. Alcohol can be sold only in the same transaction as a meal. When operating outdoors, they must follow the dine-in restaurant guidance and should continue to encourage takeout and delivery service whenever possible.

  b. Bars, pubs, brewpubs, and breweries that do not provide sit-down meals themselves, but can contract with another vendor to do so, can serve dine-in meals when operating outdoors provided both businesses follow the dine-in restaurant guidance and alcohol is sold only in the same transaction as a meal.

  c. Venues that are currently authorized to provide off sale beer, wine, and spirits to be consumed off premises and do not offer sit-down, dine-in meals must follow the guidance for retail operations and offer curbside sales only.

  d. Concert, performance, or entertainment venues must remain closed until they are allowed to resume modified or full operation through a specific reopening order or guidance. Establishments that serve full meals must discontinue this type of entertainment until these types of activities are allowed to resume modified or full operation.

2. Indoor operations shall be restricted across the state as specified below:

  a. Dine-in restaurants must close indoor seating to customers. During this closure all dine-in restaurants may continue to utilize outdoor seating and must comply with the guidance for outdoor dining. Restaurants should continue to encourage takeout and delivery service whenever possible.

  b. Wineries and tasting rooms must close indoor services to customers. During this closure all wineries and tasting rooms operating outdoors must comply with the guidance for restaurants, wineries, and bars.

  c. Family entertainment centers and movie theaters must close indoor services and attractions to customers.

    1. Family entertainment centers may continue to provide outdoor services and attractions to customers, and must comply with the guidance for movie theaters and family entertainment centers.

Exhibit 3
006

    2. Drive-in movie theaters may continue to operate and should follow additional applicable guidance for <u>drive-in movie theaters</u>.

  d. Indoor attractions at zoos and museums must close to visitors.

    1. Zoos and museums may continue to operate outdoor attractions and must follow the <u>guidance for zoos and museums</u>.

  e. Cardrooms must close indoor services to customers and must follow the <u>guidance for cardrooms</u>.

### **Order for Closure of Additional Indoor Sectors for Counties on Monitoring List**

3. Counties that currently appear on CDPH's County Monitoring List and have been on the list for three consecutive days, and counties that subsequently appear for three consecutive days or more while this order remains effective, must close all indoor operations of the following types of businesses/events/activities:

  a. Gyms and Fitness Centers
  b. Places of Worship
  c. Protests
  d. Offices for <u>Non-Critical Infrastructure Sectors</u>
  e. Personal Care Services (including nail salons, massage parlors, and tattoo parlors)
  f. Hair salons and barbershops
  g. Malls

### **Terms of Orders**

4. This order shall go into effect immediately.

5. These closures shall remain in effect until I determine it is appropriate to modify the order based on public health conditions.

6. Outdoor operations may be conducted under a tent, canopy, or other sun shelter but only as long as no more than one side is closed, allowing sufficient outdoor air movement.

7. I will continue to monitor the epidemiological data and will modify the sectors that may be open both statewide and in counties on the Monitoring List as required by the evolving public health conditions. If I determine that it is appropriate to reopen, close, or modify the operations of any additional sectors, those sectors will be posted at: <u>https://covid19.ca.gov/roadmap-counties/</u>.

8. My <u>guidance</u> mandating the wearing of face coverings and my <u>guidance</u> prohibiting gatherings continue to apply statewide, except as specifically permitted in other orders or guidance documents. To prevent further spread of COVID-19 to and within other

Exhibit 3
007

jurisdictions within the State, Californians should not travel significant distances and should stay close to home.

9. This order is issued pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120150, 120175,120195 and 131080.

Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health

Exhibit 3
008

Exhibit 4

# CDC Now Recommends Americans Consider Wearing Cloth Face Coverings In Public

*Colin Dwyer Twitter*

Exhibit 4
009



A pedestrian in a face mask crosses the Williamsburg Bridge in New York City last month. U.S. health authorities have announced they're changing the official recommendations on face masks, now urging people to wear them in public spaces to help slow the spread of the coronavirus. **Bryan R. Smith/AFP via Getty Images hide caption**

Exhibit 4
010

**toggle caption**

Bryan R. Smith/AFP via Getty Images



A pedestrian in a face mask crosses the Williamsburg Bridge in New York City last month. U.S. health authorities have announced they're changing the official recommendations on face masks, now urging people to wear them in public spaces to help slow the spread of the coronavirus.

Bryan R. Smith/AFP via Getty Images

**Updated at 8:35 p.m. ET**

President Trump said Friday the Centers for Disease Control and Prevention now recommends that people wear cloth or fabric face coverings, which can be made at

Exhibit 4
011

home, when entering public spaces such as grocery stores and public transit stations. It is mainly to prevent those people who have the virus — and might not know it — from spreading the infection to others.

The guidelines do not give many details about coverings beyond: "cloth face coverings fashioned from household items or made at home from common materials at low cost can be used as an additional, voluntary public health measure."

Trump emphasized that wearing masks in public is voluntary and said he will not be doing so.

A federal official tells NPR that the White House pressured the agency to limit the scope of the wording of the new guidance. The CDC wanted to emphasize that the recommendation could be helpful for Americans in all parts of the country, given that it is becoming increasing difficult to designate particular areas as "hot spots," since the virus is present in so many areas of the country. In the end, this source tells NPR, the White House insisted the guidance emphasize the use of face coverings in areas where there is widespread community transmission of the virus.

U.S. health authorities had discouraged healthy Americans from wearing facial coverings for weeks, saying they were likely to do more harm than good in the fight against the coronavirus — but now, as researchers have learned more about how the highly contagious virus spreads, officials have changed their recommendations.

U.S. health authorities have long maintained that face masks should be reserved only for medical professionals and patients suffering from COVID-19, the deadly disease caused by the coronavirus. The CDC had based this recommendation on the fact that such coverings offer little protection for wearers, and the need to conserve the country's alarmingly sparse supplies of personal protective equipment.

Still, as the virus spread to every state in the U.S., it has become clear that people can contract and spread the virus without showing symptoms, rendering it difficult — if not impossible — to distinguish healthy from infected individuals without a formal test. So, it may protect other people who come into contact with the unknowing individual.

And the mask need not be professional-grade to offer some benefit. In fact, officials say it probably shouldn't be: The CDC recommends constructing your own cloth mask, so as to help ensure that doctors and nurses can obtain access to medical-grade surgical or N95 masks amid a widespread shortage of supplies.

With this announcement, the U.S. is following the lead of a number of other countries that have been urging — or outright ordering — their residents to don masks in public. The expanding list includes China and South Korea, where officials have even taken the step of distributing masks.

And while the European Centre for Disease Prevention and Control continues to discourage the use of face masks, some European countries, such as Austria and the Czech Republic, have told their residents to cover up their mouths and noses before entering a store.

This week, the mayors of Los Angeles and New York City also urged residents to do the same.

Exhibit 4
012

Exhibit 5

# New IHME COVID-19 Model Projects Nearly 180,000 US Deaths

*However, high levels of mask wearing could reduce forecasted deaths by nearly 33,060*

*Next two weeks will show whether surge in deaths follows increase in cases*

SEATTLE (June 24, 2020) – In its first projections comparing different actions to control COVID-19 transmission, the Institute for Health Metrics and Evaluation (IHME) at the University of Washington is forecasting nearly 180,000 in the United States will die by October 1.

The forecast shows 179,106 deaths (with a range of 159,497 to 213,715). Those numbers drop to 146,047 (with a range of 140,849 to 153,438), if at least 95 percent of people wear masks in public.

"There is no doubt that even as states open up, the United States is still grappling with a large epidemic on a course to increase beginning in late August and intensifying in September," said IHME Director Dr. Christopher Murray. "People need to know that wearing masks can reduce transmission of the virus by as much as 50 percent, and those who refuse are putting their lives, their families, their friends, and their communities at risk."

The new US forecast is lower than the forecast of 201,129 deaths released on June 15. California and other states have seen over the past several weeks increasing case numbers, but deaths are not yet rising at the same rate, a trend which could change in the coming weeks

"States reporting the ages of confirmed cases suggest there are more cases being detected in younger people who are at substantially lower risk of death than older people," Murray said. "It remains to be seen how this will unfold over the next few weeks, and if transmission continues to go up, we may see increasing infections in at-risk populations."

IHME's new projections include the re-imposition of strong social distancing mandates when deaths per day reach a level of 8 per one million people, but currently only Texas and Florida reach this level of resurgence before October 1. Mask wearing at current reported rates is included in the model.

"These factors are vital in our projections and highlight how many lives can be saved," Murray said.

The forecasts by state with and without 95% percent wearing masks are:

- Alabama: With mask use 1,334 (range of 1,118 to 1,644) / Without mask use 2,008 (range of 1,301 to 3,384)
- Alaska: 18 (range of 14 to 31) / 30 (range of 16 to 97)
- Arizona: 3,195 (range of 2,389 to 4,623) / 5,687 (range of 3,163 to 11,174)
- Arkansas: 576 (range of 374 to 1,028) / 988 (range of 431 to 2,601)

Exhibit 5
013

- California: 8,745 (range of 7,709 to 10,489) / 11,631 (range of 9,093 to 17,007)
- Colorado: 1,796 (range of 1,687 to 2,047) / 1,920 (range of 1,699 to 2,651)
- Connecticut: 4,473 (range of 4,395 to 4,605) / 4,513 (range of 4,411 to 4,693)
- Delaware: 488 (range of 466 to 522) / 501 (range of 470 to 554)
- District of Columbia: 619 (range of 590 to 664) / 668 (range of 610 to 775)
- Florida: 7,523 (range of 5,249 to 12,530) / 15,393 (range of 7,272 to 39,303)
- Georgia: 4,269 (range of 3,419 to 5,888) / 6,614 (range of 3,977 to 12,291)
- Hawaii: 28 (range of 23 to 44) / 48 (range of 25 to 149)
- Idaho: 112 (range of 105 to 122) / 124 (range of 109 to 146)
- Illinois: 7,717 (range of 7,296 to 8,295) / 8,487 (range of 7,560 to 9,936)
- Indiana: 2,832 (range of 2,691 to 3,022) / 3,303 (range of 2,917 to 3,882)
- Iowa: 815 (range of 769 to 894) / 874 (range of 791 to 1,042)
- Kansas: 340 (range of 306 to 395) / 428 (range of 334 to 624)
- Kentucky: 689 (range of 608 to 847) / 829 (range of 638 to 1,295)
- Louisiana: 3,702 (range of 3,439 to 4,191) / 4,135 (range of 3,550 to 5,580)
- Maine: 116 (range of 113 to 121) / 118 (range of 113 to 125)
- Maryland: 3,434 (range of 3,324 to 3,574) / 3,611 (range of 3,398 to 3,894)
- Massachusetts: 8,553 (range of 8,357 to 8,793) / 8,802 (range of 8,483 to 9,208)
- Michigan: 6,354 (range of 6,251 to 6,517) / 6,534 (range of 6,333 to 6,937)
- Minnesota: 1,701 (range of 1,625 to 1,803) / 1,797 (range of 1,676 to 1,970)
- Mississippi: 1,141 (range of 1,074 to 1,242) / 1,237 (range of 1,118 to 1,438)
- Missouri: 1,624 (range of 1,269 to 2,396) / 2,778 (range of 1,506 to 6,349)
- Montana: 29 (range of 23 to 44) / 39 (range of 24 to 98)
- Nebraska: 376 (range of 306 to 505) / 529 (range of 328 to 1,000)
- Nevada: 655 (range of 580 to 824) / 788 (range of 602 to 1,355)
- New Hampshire: 542 (range of 431 to 784) / 668 (range of 449 to 1,230)
- New Jersey: 13,551 (range of 13,299 to 13,878) / 13,808 (range of 13,385 to 14,395)
- New Mexico: 669 (range of 541 to 1,002) / 851 (range of 558 to 1,852)
- New York: 31,729 (range of 31,606 to 31,866) / 31,837 (range of 31,676 to 32,021)
- North Carolina: 1,647 (range of 1,480 to 1,901) / 1,957 (range of 1,585 to 2,689)
- North Dakota: 88 (range of 83 to 95) / 92 (range of 84 to 104)
- Ohio: 3,280 (range of 3,070 to 3,614) / 3,781 (range of 3,282 to 4,759)
- Oklahoma: 465 (range of 428 to 526) / 546 (range of 451 to 728)
- Oregon: 359 (range of 276 to 532) / 836 (range of 357 to 2,312)
- Pennsylvania: 7,238 (range of 6,833 to 7,814) / 7,799 (range of 7,017 to 9,214)
- Rhode Island: 1,085 (range of 1,029 to 1,179) / 1,120 (range of 1,045 to 1,252)
- South Carolina: 922 (range of 799 to 1,106) / 1,172 (range of 866 to 1,712)
- South Dakota: 133 (range of 109 to 175) / 174 (range of 118 to 290)
- Tennessee: 793 (range of 680 to 973) / 941 (range of 719 to 1,367)
- Texas: 5,582 (range of 4,033 to 8,485) / 13,736 (range of 6,372 to 30,535)
- Utah: 273 (range of 227 to 347) / 398 (range of 260 to 707)
- Vermont: 63 (range of 62 to 65) / 66 (range of 63 to 72)
- Virginia: 1,758 (range of 1,722 to 1,810) / 1,788 (range of 1,738 to 1,867)
- Washington: 1,556 (range of 1,488 to 1,655) / 1,917 (range of 1,704 to 2,272)
- West Virginia: 108 (range of 103 to 116) / 113 (range of 104 to 124)
- Wisconsin: 930 (range of 858 to 1,036) / 1,076 (range of 912 to 1,401)
- Wyoming: 21 (range of 19 to 23) / 21 (range of 19 to 26)

"States are attempting the difficult balancing act of preserving health and enabling

Exhibit 5
014

economic recovery," Murray said. "Going forward, IHME will continue to forecast for different scenarios including planned intermittent mandates in the fall when deaths per day may reach higher levels within each state, recognizing that solutions are not uniform across communities."

The new death projections and other information, such as hospital resources usage, are available at https://covid19.healthdata.org.

**Contact:** media@healthdata.org

### A note of thanks

We wish to warmly acknowledge the support of these and others who have made our COVID-19 estimation efforts possible: ACAPS; American Hospital Association; Bill & Melinda Gates Foundation; Blavatnik School of Government, University of Oxford; Bloomberg Philanthropies; Boston Children's/Health Map; California Health Care Foundation; Carnegie Mellon University; Christopher Adolph and colleagues at the Department of Political Science, University of Washington; Descartes Labs; Facebook Data for Good; Google Labs; John Stanton & Theresa Gillespie; Julie & Erik Nordstrom; Kaiser Family Foundation; Medtronic Foundation; Microsoft AI for Health; National Institute on Minority Health and Health Disparities (NIMHD) at the National Institutes of Health (NIH); National Science Foundation; Our World in Data; Premise; Qumulo; Real Time Medical Systems; Redapt; SafeGraph; The COVID Tracking Project; The Johns Hopkins University; The Kuwait Foundation for the Advancement of Sciences (KFAS); The New York Times; UNESCO; University of Maryland; University of Miami Institute for Advanced Study of the Americas (Felicia Knaul and Michael Touchton); Wellcome Trust; World Health Organization; and finally, the many Ministries of Health and Public Health Departments across the world, collaborators and partners for their tireless data collection efforts. Thank you.

### About the Institute for Health Metrics and Evaluation

The Institute for Health Metrics and Evaluation (IHME) is an independent global health research organization at the University of Washington School of Medicine that provides rigorous and comparable measurement of the world's most important health problems and evaluates the strategies used to address them. IHME is committed to transparency and makes this information widely available so that policymakers have the evidence they need to make informed decisions on allocating resources to improve population health.

Exhibit 5
015

Exhibit 6

# SARS-CoV-2 Infections and Serologic Responses from a Sample ...

*Weekly / June 12, 2020 / 69(23);714–721*

*On June 9, 2020, this report was posted online as an MMWR Early Release.*

Daniel C. Payne, PhD[1]; Sarah E. Smith-Jeffcoat, MPH[1]; Gosia Nowak, MPH[2]; Uzo Chukwuma, MPH[2]; Jesse R. Geibe, MD[2]; Robert J. Hawkins, PhD, DNP[2]; Jeffrey A. Johnson, PhD[1]; Natalie J. Thornburg, PhD[1]; Jarad Schiffer, MS[1]; Zachary Weiner, PhD[1]; Bettina Bankamp, PhD[1]; Michael D. Bowen, PhD[1]; Adam MacNeil, PhD[1]; Monita R. Patel, PhD[1]; Eric Deussing, MD[2]; CDC COVID-19 Surge Laboratory Group; Bruce L. Gillingham, MD[2] (View author affiliations)

View suggested citation

## Summary

**What is already known about this topic?**

Information about COVID-19 among young adults is limited.

**What is added by this report?**

Among a convenience sample of 382 young adult U.S. service members aboard an aircraft carrier experiencing a COVID-19 outbreak, 60% had reactive antibodies, and 59% of those also had neutralizing antibodies at the time of specimen collection. One fifth of infected participants reported no symptoms. Preventive measures, such as using face coverings and observing social distancing, reduced risk for infection.

**What are the implications for public health practice?**

Young, healthy adults with COVID-19 might have mild or no symptoms; therefore, symptom-based surveillance might not detect all infections. Use of face coverings and other preventive measures could mitigate transmission. The presence of neutralizing antibodies among the majority is a promising indicator of at least short-term immunity.

**Altmetric:**

**Citations:** 0

**Views:** 47,417

*Views equals page views plus PDF downloads*

Compared with the volume of data on coronavirus disease 2019 (COVID-19) outbreaks among older adults, relatively few data are available concerning COVID-19 in younger, healthy persons in the United States (*1*,*2*). In late March 2020, the aircraft carrier USS Theodore Roosevelt arrived at port in Guam after numerous U.S. service members onboard developed COVID-19. In April, the U.S. Navy and CDC investigated this outbreak, and the demographic, epidemiologic, and laboratory findings among a convenience sample of 382 service members serving aboard the aircraft carrier are reported in this study. The outbreak was characterized by widespread transmission with relatively mild symptoms and asymptomatic infection among this sample of mostly young, healthy adults with close, congregate exposures. Service members who reported taking preventive measures had a lower infection rate than did those who did not report taking these measures (e.g., wearing a face covering, 55.8% versus 80.8%; avoiding common areas, 53.8% versus 67.5%; and observing social distancing, 54.7% versus 70.0%, respectively). The presence of neutralizing antibodies, which represent antibodies that inhibit SARS-CoV-2, among the majority (59.2%) of those with antibody responses is a promising indicator of at least short-term immunity. This report improves the understanding of COVID-19 in the U.S. military and among young adults in congregate settings and reinforces the importance of preventive measures to lower risk for infection in similar environments.

In mid-January, the USS Theodore Roosevelt was deployed to the western Pacific. An outbreak of COVID-19 occurred during deployment, which resulted in the aircraft carrier stopping in Guam at the end of March. During this time, approximately 1,000 service members were determined to be infected with SARS-CoV-2, the virus that causes COVID-19. The United States Navy and CDC investigated this ongoing outbreak during April 20–24; 382 service members voluntarily completed questionnaires and provided serum specimens (a convenience sample comprising 27% of 1,417 service members staying at the base on Guam or on the ship). The 1,417 included persons who were previously infected, currently infected, or never infected. Among these 382 service members, 267 (70%) also provided a nasopharyngeal (NP) swab specimen. Serum specimens were tested for antibody reactivity using a CDC-developed, SARS-CoV-2 spike protein enzyme-linked immunosorbent assay (ELISA) (a pan-immunoglobulin assay) as an indicator of previous SARS-CoV-2 exposure and infection; signal threshold ratio ≥1 was defined as a positive ELISA result (*3*). ELISA-positive specimens were further tested for neutralizing antibodies using a microneutralization assay to detect presence of SARS-CoV-2 inhibiting antibodies (antibody titers >40 defined as positive). Real-time reverse transcription–polymerase chain reaction (RT-PCR) testing of NP swab specimens was used to detect SARS-CoV-2 RNA (*4*). Previous or current SARS-CoV-2 infection was defined as a positive real-time RT-PCR result or positive ELISA result.

At the time of specimen collection, participants completed a questionnaire eliciting information on demographic characteristics, exposure, COVID-19 protective behaviors, health history, and symptoms; participants also reported whether they had had a previous positive COVID-19 test since deployment but before this investigation. Protective behaviors listed on the questionnaire were not mutually exclusive, so participants could select all that applied. Reported symptoms were categorized using the Council of State and Territorial Epidemiologists (CSTE) case definition for COVID-19 (*5*), including category A (at least cough or shortness of breath/difficulty breathing) and category B (no cough or shortness of breath, but two or more other symptoms*) or neither. Demographic, exposure, and symptom characteristics and engagement in protective behaviors were compared among participants infected with SARS-CoV-2 and those having no evidence of previous or current infection, and unadjusted odds ratios (ORs) with 95% confidence intervals (CIs) were calculated. Analyses were performed using SAS statistical software (version 9.4; SAS Institute).

Exhibit 6
016

Among the 382 survey participants (Figure 1), 289 (75.7%) were male; their median age was 30 years (interquartile range [IQR] = 24–35 years), 223 (58.4%) were non-Hispanic white, and 28 (7.3%) reported a history of asthma, hypertension, diabetes, or immunosuppression (Table). Among 238 (62.0%) participants with previous or current SARS-CoV-2 infection, 194 (81.5%) reported one or more symptoms, 44 (18.5%) were asymptomatic, and two (0.8%) were hospitalized for COVID-19. Among all participants, the prevalence of previous or current infection among males was higher than that among females (OR = 1.8) but did not differ significantly by age, race, ethnicity, or history of a preexisting medical condition.

Among 284 symptomatic participants (194 [68.3%] with previous or current SARS-CoV-2 infections and 90 [31.7%] without), loss of taste (ageusia) or smell (anosmia) were the symptoms most strongly associated with previous or current infection (OR = 10.3), followed by fever (OR = 2.8), chills (OR = 2.7), and myalgia (OR = 2.6) (Figure 2). CSTE-defined category B symptoms were more strongly associated with infection (OR = 5.8) than were category A symptoms (OR = 3.5). Reporting four or more symptoms and seeking medical care for symptoms (OR = 2.3) were significantly associated with infection.

Overall, 228 (59.7%) participants had a positive ELISA result, and among those, 135 (59.2%) also had a positive microneutralization test result. Among those with positive ELISA results, Hispanic/Latino participants were more likely to have positive microneutralization test results (33 of 44; 75.0%) than were participants of non-Hispanic/Latino or unspecified ethnicity (102 of 184; 55.4%) (OR = 2.4; 95% CI = 1.1–5.1). Among the 267 participants who provided an NP swab, 98 (51.9%) had a positive real-time RT-PCR result; 171 (64.0%) persons who provided an NP swab had a positive ELISA result. Among 235 participants who reported a positive SARS-CoV-2 test result before this investigation (defined as during this deployment, mid-January to April 20–24, 2020), 212 (90.2%) had positive ELISA results compared with 16 (10.9%) among 147 not reporting previous positive test results for SARS-CoV-2 (OR = 75.5; 95% CI = 38.5–148.1).

Among 191 symptomatic participants who reported a symptom onset date and had positive real-time RT-PCR results, positive ELISA results, or both, eight had positive real-time RT-PCR and negative ELISA results; for these participants, ≤15 days had elapsed since symptom onset at the time of specimen collection (Figure 3). Among symptomatic participants with positive ELISA results and positive microneutralization test results (n = 107), a median of 22 days (IQR = 15–26) had elapsed since symptom onset at the time of specimen collection (Figure 3). Among 12 participants with positive ELISA results >40 days after symptom onset, eight maintained positive microneutralization test results, including two participants who were tested >3 months after symptom onset.

Prevalence of previous or current infection was higher among participants who reported contact with someone known to have COVID-19 (64.2%), compared with those who did not (41.7%) (OR = 2.5; 95% CI = 1.1–5.8); prevalence was also higher among persons who reported sharing the same sleeping berth with a crewmember who had positive test results (65.6%), compared with those who did not (36.4%) (OR = 3.3; 95% CI = 1.8–6.1). Lower odds of infection were independently associated with self-report of wearing a face covering (55.8% versus 80.8%; OR = 0.3; 95% CI = 0.2–0.5), avoiding common areas (53.8% versus 67.5%; OR = 0.6; 95% CI = 0.4–0.9), and observing social distancing (54.7% versus 70.0%; OR = 0.5; 95% CI = 0.3–0.8), compared with service members who did not report these behaviors.

## Discussion

In this convenience sample of young, healthy U.S. service members experiencing close contact aboard an aircraft carrier, those with previous or current SARS-CoV-2 infection experienced mild illness overall, and nearly 20% were asymptomatic. Approximately one third of participants reported fever, myalgia, and chills and had higher odds of SARS-CoV-2 infection than did persons who reported cough and shortness of breath. Participants reporting anosmia (loss of sense of smell) or ageusia (loss of sense of taste) had 10 times the odds of having infection, compared with those who did not.

A study of adolescents and young adults with mild COVID-19 illness in China found rapid propagation of chains of transmission by asymptomatic persons (6). Reporting symptoms of anosmia and ageusia was common, and these symptoms are recognized in other respiratory viral infections as well. Acute anosmia was reported among one in seven COVID-19 patients in a South Korean study and was perceived to be an important sign of the disease (7). Others concluded that new onset anosmia should be considered SARS-CoV-2 infection until proven otherwise and recommended immediate isolation and confirmatory testing in persons with this symptom (8). Whereas anosmia or ageusia alone was predictive of COVID-19, absence of either of these symptoms should not be used to rule out SARS-CoV-2 infection.

Nearly two thirds of persons in this sample had positive ELISA test results, which indicate previous exposure to SARS-CoV-2. Among those who provided NP swab samples, approximately one third had positive real-time RT-PCR test results, some having recent symptom onset without evidence of having yet developed an antibody response. In another study, seroconversion among laboratory-confirmed COVID-19 patients was observed a median of 11 days after symptom onset for total antibodies and longer for more virus-specific antibodies, including neutralizing antibodies (9). The results from the current study reflect the intensity of exposure experienced by these participants and the recency of the outbreak at the time of specimen collection.

The shipboard environment presents substantial challenges for reducing viral transmission because of congregate living quarters and close working environments. The significant association of infection and male sex could reflect an association with berthing, which is separated by sex aboard the ship. Protective behaviors included wearing a face covering and maintaining physical distance. Multiple cruise ship outbreaks have documented undetected transmission of SARS-CoV-2 because of mild and asymptomatic infection (10). In outbreak investigations of younger crew members aboard cruise vessels, transmission was associated with working on the same deck and being within the same occupational group as persons with confirmed cases (1).

In this sample of intensely exposed subjects, assessed at a single point in time, results demonstrated that antibodies developed and that, at the time of specimen collection, many of these were neutralizing antibodies. Affinity maturation of antibodies is an important determinant for the outcome of viral infection. High-affinity antibodies can elicit neutralization by recognizing specific proteins on the surface of the virus, and these might be produced early or late in the course of viral infection. Approximately one half of the participants with positive ELISA results also had neutralizing antibodies, which indicate functional antibodies that would be expected to inhibit SARS-CoV-2 infection. This is a promising indicator of immunity, and in several participants, neutralizing antibodies were still detectable >40 days after symptom onset. Ongoing studies assessing the humoral antibody response over time will aid the interpretation of serologic results in an outbreak investigation such as this.

The findings in this report are subject to at least four limitations. First, the analysis was conducted on a convenience sample of persons who might have had a higher likelihood of exposure, and all information was based on self-report, raising the possibility of selection and recall biases. The sex and ethnic distribution of the participants was similar to that of all service members aboard the aircraft carrier, although survey participants were slightly older and of a slightly different racial distribution; therefore, they might not be a representative sample. Second, this analysis was limited by the lack of temporal data on previous positive test results for SARS-CoV-2,

Exhibit 6
017

which complicates interpretation of the ELISA and microneutralization assays. Third, although the date of any symptom onset was collected, information on timing, duration, and severity of individual symptoms was not collected. Finally, the cross-sectional nature of these data might underestimate the eventual antibody response and neutralizing antibody activity among persons tested early in the course of their infections.

These results provide new indications of symptomatology of SARS-CoV-2 infections and serologic responses among a cohort of young U.S. adults living in a congregate environment and contribute to a better understanding of COVID-19 epidemiology in the U.S. military. The findings reinforce the importance of nonpharmaceutical interventions such as wearing a face covering, avoiding common areas, and observing social distancing to lower risk for infection in similar congregate living settings.

## Acknowledgments

Service members aboard the USS Theodore Roosevelt; Naval Medical Forces Pacific; Navy Environmental and Preventive Medicine Units 2 and 6; U.S. Naval Hospital Guam; Lisa Pearse, Brianna Rupp, Jefferson Moody, Azad Al-Koshnaw, W. Thane Hancock, John Brooks, Azaibi Tamin, Jennifer Harcourt, Mohammed Ata Ut Rasheed, Jan Vinjé, Amy Hopkins, Eric Katz, Hannah Browne, Kenny Nguyen, Leslie Barclay, Mathew Esona, Rashi Gautam, Slavica Mijatovic-Rustempasic, Sung-Sil Moon, Sandra Lester, Lisa Mills, Brandi Freeman; CDC laboratory staff members.

### CDC COVID-19 Surge Laboratory Group

Rebekah Tiller, MPH, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases; Rene Galloway, MPH, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases; Shannon Rogers, MS, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases; Brett Whitaker, MS, Division of Viral Diseases National Center for Immunization and Respiratory Diseases; Ashley Kondas, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases; Peyton Smith, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases; Christopher Lee, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases; James Graziano, Division of Viral Diseases, National Center for Immunization and Respiratory Diseases.

Corresponding author: Daniel C. Payne, dvp6@cdc.gov, 404-639-2784.

---

[1]CDC; [2]U.S. Navy.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

\* Fever, chills, muscle pain, headache, sore throat, new taste or smell disorder.

## References

1. Kakimoto K, Kamiya H, Yamagishi T, Matsui T, Suzuki M, Wakita T. Initial investigation of transmission of COVID-19 among crew members during quarantine of a cruise ship—Yokohama, Japan, February 2020. MMWR Morb Mortal Wkly Rep 2020;69:312–3. CrossRefexternal icon PubMedexternal icon
2. Kimball A, Hatfield KM, Arons M, et al.; Public Health – Seattle & King County; CDC COVID-19 Investigation Team. Asymptomatic and presymptomatic SARS-CoV-2 infections in residents of a long-term care skilled nursing facility—King County, Washington, March 2020. MMWR Morb Mortal Wkly Rep 2020;69:377–81. CrossRefexternal icon PubMedexternal icon
3. Freeman B, Lester S, Mills L, et al. Validation of a SARS-CoV-2 spike protein ELISA for use in contact investigations and sero-surveillance [Preprint]. bioRxiv 2020. https://www.biorxiv.org/content/10.1101/2020.04.24.057323v2external icon
4. CDC. CDC 2019-novel coronavirus (2019-nCoV) real-time RT-PCR diagnostic panel Atlanta, GA: US Department of Health and Human Services, Food and Drug Administration; 2020. https://www.fda.gov/media/134922/downloadexternal icon
5. Council of State and Territorial Epidemiologists. Standardized surveillance case definition and national notification for 2019 novel coronavirus disease (COVID-19). Atlanta, GA: Council of State and Territorial Epidemiologists; 2020 https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdfpdf iconexternal icon
6. Huang L, Zhang X, Zhang X, et al. Rapid asymptomatic transmission of COVID-19 during the incubation period demonstrating strong infectivity in a cluster of youngsters aged 16–23 years outside Wuhan and characteristics of young patients with COVID-19: a prospective contact-tracing study. J Infect 2020;80:e1–13. CrossRefexternal icon PubMedexternal icon
7. Lee Y, Min P, Lee S, Kim SW. Prevalence and duration of acute loss of smell or taste in COVID-19 patients. J Korean Med Sci 2020;35:e174. CrossRefexternal icon
8. Reinhard A, Ikonomidis C, Broome M, Gorostidi F. Anosmia and COVID-19 [French]. Rev Med Suisse 2020;16:849–51. PubMedexternal icon
9. Zhao J, Yuan Q, Wang H, et al. Antibody responses to SARS-CoV-2 in patients of novel coronavirus disease 2019. Clin Infect Dis. Epub Mar 28, 2020. https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa344/5812996external icon
10. Moriarty LF, Plucinski MM, Marston BJ, et al.; CDC Cruise Ship Response Team; California Department of Public Health COVID-19 Team; Solano County COVID-19 Team. Public health responses to COVID-19 outbreaks on cruise ships—worldwide, February–March 2020. MMWR Morb Mortal Wkly Rep 2020;69:347–52. CrossRefexternal icon PubMedexternal icon

Return

**FIGURE 1. Laboratory results among a convenience sample of U.S. service members who provided serum specimens\* (N = 382) and nasopharyngeal swabs (N = 267) for SARS-CoV-2 testing — USS Theodore Roosevelt, April 2020**

Exhibit 6
018



**Abbreviations:** Ab = antibody; ELISA = enzyme-linked immunosorbent assay; Inc = inconclusive; Neg = negative; Pos = positive; RT-PCR = real-time reverse transcription–polymerase chain reaction.

\* Of those with positive serum ELISA tests, 59% demonstrated positive microneutralization tests.

TABLE. Comparison of U.S. Navy service members with and without previous or current SARS-CoV-2 infection (N = 382) — USS Theodore Roosevelt, April 2020

| Characteristic | No. (%) | | Infection versus no infection OR (95% CI)[†] |
| --- | --- | --- | --- |
| | Current or previous SARS-CoV-2 infection* (N = 238) | No evidence of SARS-CoV-2 infection (N = 144) | |
| **RT-PCR and antibody results** | | | |
| RT-PCR positive and ELISA positive | 88 (37.0) | 0 | N/A |
| RT-PCR negative and ELISA positive | 83 (34.9) | 0 | N/A |
| RT-PCR positive and ELISA negative | 10 (4.2) | 0 | N/A |

Exhibit 6
019

| Characteristic | No. (%) | | Infection versus no infection OR (95% CI)[†] |
|---|---|---|---|
| | Current or previous SARS-CoV-2 infection* (N = 238) | No evidence of SARS-CoV-2 infection (N = 144) | |
| RT-PCR not done and ELISA positive | 57 (23.9) | 0 | N/A |
| RT-PCR negative or not done and ELISA negative | 0 | 144 (100) | N/A |
| **Sex** | | | |
| Male | 190 (65.7) | 99 (34.3) | 1.80 (1.12–2.89)[§] |
| Female | 48 (51.6) | 45 (48.4) | Referent |
| **Age group (yrs)** | | | |
| 18–24 | 77 (68.1) | 36 (31.9) | Referent |
| 25–29 | 50 (64.1) | 28 (35.9) | 0.84 (0.45–1.54) |
| 30–39 | 87 (58.8) | 61 (41.2) | 0.67 (0.40–1.11) |
| 40–59 | 24 (55.8) | 19 (44.2) | 0.59 (0.29–1.21) |
| **Race/Ethnicity[¶]** | | | |
| AI/AN or NH/PI | 9 (60.0) | 6 (40.0) | 0.86 (0.29–2.49) |
| Asian | 13 (61.9) | 8 (38.1) | 0.93 (0.37–2.33) |
| Black | 25 (61.0) | 16 (39.0) | 0.89 (0.45–1.77) |
| Hispanic/Latino | 47 (61.8) | 29 (38.2) | 0.92 (0.54–1.58) |
| Other/Unknown | 2 (33.3) | 4 (66.7) | 0.29 (0.05–1.59) |
| White | 142 (63.7) | 81 (36.3) | Referent |
| **History of asthma, hypertension, diabetes, or immunosuppression** | 15 (53.6) | 13 (46.4) | 0.68 (0.31, 1.47) |
| **Reported ≥1 symptom** | | | |
| Yes | 194 (81.5) | 90 (62.5) | 2.65 (1.65–4.23)[§] |
| No | 44 (18.5) | 54 (37.5) | Referent |
| **Symptoms (among those reporting ≥1 symptom)** | | | |
| **Symptoms (CSTE criteria)**\*\* | | | |
| Category A | 97 (50.0) | 36 (40.0) | 3.50 (1.90–6.45)[§] |
| Category B | 67 (34.5) | 15 (16.7) | 5.81 (2.78–12.11)[§] |
| Other symptom(s) | 30 (15.5) | 39 (43.3) | Referent |
| **Individual symptoms** | | | |
| Loss of taste, smell, or both | 119 (61.3) | 12 (13.3) | 10.31 (5.26–20.21)[§] |
| Palpitations | 19 (9.8) | 3 (3.3) | 3.15 (0.91–10.93) |
| Fever (documented or subjective) | 89 (45.9) | 21 (23.3) | 2.79 (1.58–4.90)[§] |
| Chills | 85 (43.8) | 20 (22.2) | 2.73 (1.54–4.84)[§] |
| Myalgia | 109 (56.2) | 30 (33.3) | 2.56 (1.52–4.32)[§] |
| Cough | 86 (44.3) | 29 (32.2) | 1.68 (0.99–2.83) |
| Nausea | 40 (20.6) | 13 (14.4) | 1.54 (0.78–3.05) |
| Fatigue | 107 (55.2) | 41 (45.6) | 1.47 (0.89–2.43) |
| Shortness of breath/difficulty breathing | 46 (23.7) | 17 (18.9) | 1.33 (0.72–2.49) |
| Chest pain | 40 (20.6) | 15 (16.7) | 1.30 (0.68–2.50) |
| Abdominal pain | 39 (20.1) | 15 (16.7) | 1.26 (0.65–2.42) |
| Runny nose | 108 (55.7) | 46 (51.1) | 1.20 (0.73–1.98) |
| Diarrhea | 47 (24.2) | 20 (22.2) | 1.12 (0.62–2.03) |

Exhibit 6
020

5 of 8

7/21/2020, 1:37 PM

| Characteristic | No. (%) | | Infection versus no infection OR (95% CI)[†] |
|---|---|---|---|
| | Current or previous SARS-CoV-2 infection* (N = 238) | No evidence of SARS-CoV-2 infection (N = 144) | |
| Headache | 129 (66.5) | 59 (65.6) | 1.04 (0.62–1.77) |
| Vomiting | 11 (5.7) | 5 (5.6) | 1.02 (0.34–3.03) |
| Sore throat | 81 (41.8) | 44 (48.9) | 0.75 (0.45–1.24) |
| **Sought medical care for symptoms** | 115 (59.3) | 35 (38.9) | 2.29 (1.37–3.82)[§] |
| **Hospitalized** | 2 (1.0) | 0 | N/A |
| **Number of symptoms** | | | |
| 1–3 | 51 (26.3) | 49 (54.4) | Referent |
| 4–5 | 37 (19.1) | 13 (14.4) | 2.74 (1.30–5.75)[§] |
| 6–8 | 50 (25.8) | 16 (17.8) | 3.00 (1.51–5.96)[§] |
| >8 | 56 (28.9) | 12 (13.3) | 4.48 (2.15–9.37)[§] |
| **Still symptomatic at time of survey (n = 275)** | | | |
| Yes | 65 (34.0) | 24 (28.6) | 1.29 (0.74–2.26) |
| No | 126 (66.0) | 60 (71.4) | Referent |
| Duration >1 week (n = 186) | 70 (55.6) | 29 (48.3) | 1.34 (0.72–2.47) |
| **Reported prevention behaviors** | | | |
| Increased hand washing | 218 (62.1) | 133 (37.9) | 0.90 (0.42–1.94) |
| Hand sanitizer use | 219 (61.5) | 137 (38.5) | 0.59 (0.24–1.44) |
| Avoiding common areas | 78 (53.8) | 67 (46.2) | 0.56 (0.37–0.86)[§] |
| Face covering use | 158 (55.8) | 125 (44.2) | 0.30 (0.17–0.52)[§] |
| Increased workspace cleaning | 195 (63.5) | 112 (36.5) | 1.30 (0.78–2.16) |
| Increased berthing cleaning | 156 (61.9) | 96 (38.1) | 0.95 (0.61–1.47) |
| Increased distance from others | 105 (54.7) | 87 (45.3) | 0.52 (0.34–0.79)[§] |

**Abbreviations:** AI/AN = American Indian or Alaska Native; CI = confidence interval; CSTE = Council of State and Territorial Epidemiologists; ELISA = enzyme-linked immunosorbent assay; N/A = not applicable; NH/PI = Native Hawaiian or other Pacific Islander; OR = odds ratio; RT-PCR = real-time reverse transcription–polymerase chain reaction.
* Current or previous SARS-CoV-2 infection is defined as a positive RT-PCR test result or a reactive antibody result determined by testing performed at CDC laboratories on specimens collected during April 20–24, 2020.
[†] Odds ratios are unadjusted.
[§] P-values <0.05 were considered statistically significant.
[¶] White, black, Asian, AIAN/NHPI, and Other persons were non-Hispanic/Latino. Hispanic/Latino persons might be of any race.
[**] Category A = ≥1 of cough or shortness of breath/difficulty breathing. Category B = no cough or shortness of breath, but ≥2 of fever, chills, muscle pain, headache, sore throat, no taste or smell disorder.

Return    **FIGURE 2. Odds ratios and 95% confidence intervals of previous or current SARS-CoV-2 infection, by individual symptoms among service members reporting at least one symptom (n = 284) — USS Theodore Roosevelt, April 2020**

Exhibit 6
021

6 of 8

7/21/20, 1:37 PM



FIGURE 3. Days from symptom onset* to specimen collection (A) among a convenience sample of participants who had positive real-time reverse transcription–polymerase chain reaction (RT-PCR) or positive enzyme-linked immunosorbent assay (ELISA) test results for SARS-CoV-2 (n = 191) and (B) microneutralization results among those with positive ELISA test results (n = 183) — USS Theodore Roosevelt, April 2020





**Abbreviations:** Ab = pan-immunoglobulin antibody response; Mn = microneutralization test.

* Three persons who reported symptoms and had previous or current infection did not report a date of symptom onset and were not included in this figure.

**Suggested citation for this article:** Payne DC, Smith-Jeffcoat SE, Nowak G, et al. SARS-CoV-2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members — USS Theodore Roosevelt, April 2020. MMWR Morb Mortal Wkly Rep 2020;69:714–721. DOI: http://dx.doi.org/10.15585/mmwr.mm6923e4external icon.

*MMWR* and *Morbidity and Mortality Weekly Report* are service marks of the U.S. Department of Health and Human Services.
Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.
References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

All HTML versions of *MMWR* articles are generated from final proofs through an automated process. This conversion might result in character translation or format errors in the HTML version. Users are referred to the electronic PDF version (https://www.cdc.gov/mmwr) and/or the original *MMWR* paper copy for printable versions of official text, figures, and tables.

Questions or messages regarding errors in formatting should be addressed to mmwrq@cdc.gov.

Exhibit 6
023

Exhibit 7

# Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists...

*Weekly / July 17, 2020 / 69(28);930-932*

*On July 14, 2020, this report was posted online as an* MMWR *Early Release.*

## Summary

### What is already known about this topic?

Consistent and correct use of cloth face coverings is recommended to reduce the spread of SARS-CoV-2.

### What is added by this report?

Among 139 clients exposed to two symptomatic hair stylists with confirmed COVID-19 while both the stylists and the clients wore face masks, no symptomatic secondary cases were reported; among 67 clients tested for SARS-CoV-2, all test results were negative. Adherence to the community's and company's face-covering policy likely mitigated spread of SARS-CoV-2.

### What are the implications for public health practice?

As stay-at-home orders are lifted, professional and social interactions in the community will present more opportunities for spread of SARS-CoV-2. Broader implementation of face covering policies could mitigate the spread of infection in the general population.

**Altmetric:**

**Citations:**

**Views:**

***Views equals page views plus PDF downloads***

Exhibit 7
024

1 of 8

7/21/2020, 1:40 PM



On May 12, 2020 (day 0), a hair stylist at salon A in Springfield, Missouri (stylist A), developed respiratory symptoms and continued working with clients until day 8, when the stylist received a positive test result for SARS-CoV-2, the virus that causes coronavirus disease 2019 (COVID-19). A second hair stylist (stylist B), who had been exposed to stylist A, developed respiratory symptoms on May 15, 2020 (day 3), and worked with clients at salon A until day 8 before seeking testing for SARS-CoV-2, which returned a positive result on day 10. A total of 139 clients were directly serviced by stylists A and B from the time they developed symptoms until they took leave from work. Stylists A and B and the 139 clients followed the City of Springfield ordinance* and salon A policy recommending the use of face coverings (i.e., surgical masks, N95 respirators,† or cloth face coverings) for both stylists and clients during their interactions. Other stylists at salon A who worked closely with stylists A and B were identified, quarantined, and monitored daily for 14 days after their last exposure to stylists A or B. None of these stylists reported COVID-19 symptoms. After stylist B received a positive test result on day 10, salon A closed for 3 days to disinfect frequently touched and contaminated areas. After public health contact tracings and 2 weeks of follow-up, no COVID-19 symptoms were identified among the 139 exposed clients or their secondary contacts. The citywide ordinance and company policy might have played a role in preventing spread of SARS-CoV-2 during these exposures. These findings support the role of source control in preventing transmission and can inform the development of public health policy during the COVID-19 pandemic. As stay-at-home orders are lifted, professional and social interactions in the community will present more opportunities for spread of SARS-CoV-2. Broader implementation of masking policies could mitigate the spread of infection in the general population.

Stylist A worked from day 0 to day 8 with COVID-19 symptoms before receiving a diagnosis of COVID-19 by polymerase chain reaction (PCR) testing. Although self-isolation was recommended after testing on day 6, stylist A continued to work until the test returned a positive result, at which time stylist A was excluded from work by salon A. On day 3, after working with stylist A, stylist B developed respiratory symptoms. During Stylist A's symptomatic period, the two stylists interacted while neither was masked during intervals between clients. Stylist B worked from day 3 to day 8 while symptomatic before self-isolating and seeking PCR testing, which

Exhibit 7
025

2 of 8                                                                                                                7/21/2020, 1:40 PM

returned a positive result for SARS-CoV-2 on day 10. Stylist A worked with clients for 8 days while symptomatic, as did stylist B for 5 days. During all interactions with clients at salon A, stylist A wore a double-layered cotton face covering, and stylist B wore a double-layered cotton face covering or a surgical mask.

The Greene County Health Department (Missouri) conducted contact tracing for all 139 exposed clients back to the dates that stylists A and B first developed symptoms. The 139 clients were monitored after their last exposure at salon A. Clients were asked to self-quarantine for 14 days and were called or sent daily text messages to inquire about any symptoms; none reported signs or symptoms of COVID-19. Testing was offered to all clients 5 days after exposure, or as soon as possible for those exposed >5 days before contact tracing began. Overall, 67 (48.2%) clients volunteered to be tested, and 72 (51.8%) refused; all 67 nasopharyngeal swab specimens tested negative for SARS-CoV-2 by PCR. Telephone interviews were attempted 1 month after initial contact tracings to collect supplementary information. Among the 139 exposed clients, the Greene County Health Department interviewed 104 (74.8%) persons.

Among the 139 clients, the mean age was 52 years (range = 21–93 years); 79 clients (56.8%) were male (Table 1). Salon appointments ranged from 15 to 45 minutes in length (median = 15 minutes; mean = 19.5 minutes). Among the 104 interviewed clients, 102 (98.1%) reported wearing face coverings for their entire appointment, and two (1.9%) reported wearing face coverings part of the time (Table 2). Types of face covering used by clients varied; 49 (47.1%) wore cloth face coverings, 48 (46.1%) wore surgical masks, five (4.8%) wore N95 respirators, and two (1.9%) did not know what kind of face covering they wore. Overall, 101 (97.1%) interviewed clients reported that their stylist wore a face covering for the entire appointment; three did not know. When asked about the type of face coverings worn by the stylists, 64 (61.5%) reported that their stylist wore a cloth face covering (39; 37.5%) or surgical mask (25; 24.0%); 40 (38.5%) clients did not know or remember the type of face covering worn by stylists. When asked whether they had experienced respiratory symptoms in the 90 days preceding their appointment, 87 (83.7%) clients reported that they had not. Of those who did report previous symptoms, none reported testing for or diagnosis of COVID-19.

Six close contacts of stylists A and B outside of salon A were identified: four of stylist A and two of stylist B. All four of stylist A's contacts later developed symptoms and had positive PCR test results for SARS-CoV-2. These contacts were stylist A's cohabitating husband and her daughter, son-in-law, and their roommate, all of whom lived together in another household. None of stylist B's contacts became symptomatic.

## Discussion

SARS-CoV-2 is spread mainly between persons in close proximity to one another (i.e., within 6 feet), and the more closely a person interacts with an infected person and the longer the interaction, the higher the risk for transmission (1). At salon A in Springfield, Missouri, two stylists with COVID-19 symptoms worked closely with 139 clients before receiving diagnoses of COVID-19, and none of their clients developed COVID-19 symptoms. Both stylists A and B, and 98% of the interviewed clients followed posted company policy and the Springfield city ordinance requiring face coverings by employees and clients in businesses providing personal care services. The citywide ordinance reduced maximum building waiting area seating to

Exhibit 7
026

25% of normal capacity and recommended the use of face coverings at indoor and outdoor public places where physical distancing was not possible. Both company and city policies were likely important factors in preventing the spread of SARS-CoV-2 during these interactions between clients and stylists. These results support the use of face coverings in places open to the public, especially when social distancing is not possible, to reduce spread of SARS-CoV-2.

Although SARS-CoV-2 is spread largely through respiratory droplets when an ill person coughs or sneezes (1), data suggest that viral shedding starts during the 2-to-3-day period before symptom onset, when viral loads are at their highest (2). Although the rate of transmission of SARS-CoV-2 from presymptomatic patients (those who have not yet developed symptoms) and asymptomatic persons (those who do not develop symptoms) is unclear, these persons likely contribute to the spread of SARS-CoV-2 (3). With the potential for presymptomatic and asymptomatic transmission, widespread adoption of policies requiring face coverings in public settings should be considered to reduce the impact and magnitude of additional waves of COVID-19.

Previous studies show that both surgical masks and homemade cloth face coverings can reduce the aerosolization of virus into the air and onto surfaces (4,5). Although no studies have examined SARS-CoV-2 transmission directly, data from previous epidemics (6,7) support the use of universal face coverings as a policy to reduce the spread of SARS-CoV-2, as does observational data for COVID-19 in an analysis of 194 countries that found a negative association between duration of a face mask or respirator policy and per-capita coronavirus-related mortality; in countries that did not recommend face masks and respirators, the per-capita coronavirus-related mortality increased each week by 54.3% after the index case, compared with 8.0% in those countries with masking policies (CT Leffler, Virginia Commonwealth University, unpublished data, 2020).[§] Similar outcomes have been observed for other respiratory virus outbreaks, including the 2002–04 outbreak of Severe Acute Respiratory Syndrome (SARS) (6) and the 2007–08 influenza season (7). A systematic review on the efficacy of face coverings against respiratory viruses analyzed 19 randomized trials and concluded that use of face masks and respirators appeared to be protective in both health care and community settings (8).

The findings in this report are subject to at least four limitations. First, whereas the health department monitored all exposed clients for signs and symptoms of COVID-19, and no clients developed symptoms, only a subset was tested; thus, asymptomatic clients could have been missed. Similarly, with a viral incubation period of 2–14 days, any COVID-19 PCR tests obtained from clients too early in their course of infection could return false-negative results. To help mitigate this possibility, all exposed clients were offered testing on day 5 and were contacted daily to monitor for symptoms until day 14. Second, although the health department obtained supplementary data, no information was collected regarding underlying medical conditions or use of other personal protective measures, such as gloves and hand hygiene, which could have influenced risk for infection. Third, viral shedding is at its highest during the 2 to 3 days before symptom onset; any clients who interacted with the stylists before they became symptomatic were not recruited for contact tracing. Finally, the mode of interaction between stylist and client might have limited the potential for exposure to the virus. Services at salon A were limited to haircuts, facial hair trimmings, and perms. Most stylists cut hair while clients are facing away from them, which might have also limited transmission.

Exhibit 7
027

The results of this study can be used to inform public health policy during the COVID-19 pandemic. A policy mandating the use of face coverings was likely a contributing factor in preventing transmission of SARS-CoV-2 during the close-contact interactions between stylists and clients in salon A. Consistent and correct use of face coverings, when appropriate, is an important tool for minimizing spread of SARS-CoV-2 from presymptomatic, asymptomatic, and symptomatic persons. CDC recommends workplace policies regarding use of face coverings for employees and clients in addition to daily monitoring of signs and symptoms of employees, procedures for screening employees who arrive with or develop symptoms at work, and posted messages to inform and educate employees and clients (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html).

## Acknowledgments

Alina Ainyette, Megan Rippee-Brooks, Jodi Caruthers.

---

[1]Washington University School of Medicine, St. Louis, Missouri; [2]University of Kansas Medical Center, Kansas City, Missouri; [3]Springfield-Greene County Health Department, Springfield, Missouri; [4]CoxHealth Infection Prevention Services, Springfield, Missouri.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. Robin Trotman reports personal fees from Merck outside the published work. No other potential conflicts of interest were disclosed.

# References

1. CDC. Clinical questions about COVID-19: questions and answers. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html
2. He X, Lau EHY, Wu P, et al. Temporal dynamics in viral shedding and transmissibility of COVID-19. Nat Med 2020;26:672–5. CrossRefexternal icon PubMedexternal icon
3. Oran DP, Topol EJ. Prevalence of asymptomatic SARS-CoV-2 infection: a narrative review. Ann Intern Med 2020;M20–3012. CrossRefexternal icon PubMedexternal icon
4. Konda A, Prakash A, Moss GA, Schmoldt M, Grant GD, Guha S. Aerosol filtration efficiency of common fabrics used in respiratory cloth masks. ACS Nano 2020;14:6339–47. CrossRefexternal icon PubMedexternal icon
5. MacIntyre CR, Seale H, Dung TC, et al. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. BMJ Open 2015;5:e006577. CrossRefexternal icon PubMedexternal icon
6. Lau JT, Tsui H, Lau M, Yang X. SARS transmission, risk factors, and prevention in Hong Kong. Emerg Infect Dis 2004;10:587–92. CrossRefexternal icon PubMedexternal icon
7. Aiello AE, Perez V, Coulborn RM, Davis BM, Uddin M, Monto AS. Facemasks, hand hygiene, and influenza among young adults: a randomized intervention

Exhibit 7
028

5 of 8    7/21/2020, 1:40 PM

trial. PLoS One 2012;7:e29744. CrossRefexternal icon PubMedexternal icon
8. MacIntyre CR, Chughtai AA. A rapid systematic review of the efficacy of face masks and respirators against coronaviruses and other respiratory transmissible viruses for the community, healthcare workers and sick patients. Int J Nurs Stud 2020;108:103629. CrossRefexternal icon PubMedexternal icon

**TABLE 1. Characteristics\* of clients (N = 139) who visited hair salon A and were exposed to stylists A and B with COVID-19 —Springfield, Missouri, May 2020**

| Characteristic | Value |
|---|---|
| **Demographic characteristic** | |
| Male, no. (%) | 79 (56.8) |
| Age, yrs. mean (range) | 52 (21–93) |
| **Encounter information** | |
| Appointment date range | May 12–20 (days 0–8[†]) |
| Exposure to stylist A, no. (%) | 84 (60.4) |
| Exposure to stylist B, no. (%) | 55 (39.6) |
| Appointment duration, mins, median (range) | 15 (15–45) |
| **Client testing** | |
| Clients tested, no. (%) | 67 (48.2) |
| Negative tests, no. (%)[§] | 67 (100) |

**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* All interviews were conducted via telephone by the Greene County Health Department.
[†] After onset of symptoms in stylist A.
[§] Among those tested.

**TABLE 2. Hair salon clients' (N = 104) responses to interview questions\* about their interactions with two stylists with COVID-19 during salon appointments — Springfield, Missouri, May 12–20, 2020**

| Interview question | Response | No. (%) |
|---|---|---|
| **Did you wear a face covering?** | Yes, for the entire appointment | 102 (98.1) |

Exhibit 7
029

6 of 8                                                                                              7/21/2020, 1:40 PM

| Interview question | Response | No. (%) |
|---|---|---|
| | Yes, for part of the appointment | 2 (1.9) |
| | No, not at all | 0 (—) |
| | Did not know | 0 (—) |
| **What type of face covering did you wear?** | Cloth face covering | 49 (47.1) |
| | Surgical mask | 48 (46.1) |
| | N95 respirator[†] | 5 (4.8) |
| | Did not know | 2 (1.9) |
| | Did not answer question | 0 (—) |
| **Did the stylist wear a face covering?** | Yes, for the entire appointment | 101 (97.1) |
| | Yes, for part of the appointment | 0 (—) |
| | No, not at all | 0 (—) |
| | Did not know | 3 (2.9) |
| **What type of face covering did the stylist wear?** | Cloth face covering | 39 (37.5) |
| | Surgical mask | 25 (24.0) |
| | N95 respirator | 0 (—) |
| | Did not know | 35 (33.7) |
| | Did not answer question | 5 (4.8) |
| **Did you have a respiratory illness in the past 90 days?** | Yes | 7 (6.7) |
| | No | 87 (83.7) |
| | Did not know | 1 (1.0) |
| | Did not answer the question | 9 (8.7) |

**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* All interviews were conducted via telephone by the Greene County Health Department.
[†] Particulate-filtering facepiece respirators that filter ≥95% of airborne particles

Exhibit 7
030

Case 3:20-cv-00998-BAS-JLB   Document 12-2   Filed 07/21/20   PageID.292   Page 46 of 86

([https://www.cdc.gov/niosh/npptl/topics/respirators/disp_part/n95list1.html](https://www.cdc.gov/niosh/npptl/topics/respirators/disp_part/n95list1.html)).

**Suggested citation for this article:** Hendrix MJ, Walde C, Findley K, Trotman R. Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri, May 2020. MMWR Morb Mortal Wkly Rep 2020;69:930-932. DOI: [http://dx.doi.org/10.15585/mmwr.mm6928e2external icon](http://dx.doi.org/10.15585/mmwr.mm6928e2external icon).

*MMWR* and *Morbidity and Mortality Weekly Report* are service marks of the U.S. Department of Health and Human Services.
Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.
References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

All HTML versions of *MMWR* articles are generated from final proofs through an automated process. This conversion might result in character translation or format errors in the HTML version. Users are referred to the electronic PDF version ([https://www.cdc.gov/mmwr](https://www.cdc.gov/mmwr)) and/or the original *MMWR* paper copy for printable versions of official text, figures, and tables.

Questions or messages regarding errors in formatting should be addressed to [mmwrq@cdc.gov](mailto:mmwrq@cdc.gov).

Exhibit 7
031

Exhibit 8

CDC Newsroom

# CDC calls on Americans to wear masks to prevent COVID-19 spread

JAMA editorial reviews latest science, while case study shows masks prevented COVID spread

## Press Release

For Immediate Release: Tuesday, July 14, 2020
**Contact:** Media Relations
(404) 639-3286

Americans are increasingly adopting the use of cloth face masks to slow the spread of COVID-19, and the latest science may convince even more to do so.

In an editorial published today in the Journal of the American Medical Association (JAMA), CDC reviewed the latest science and affirms that cloth face coverings are a critical tool in the fight against COVID-19 that could reduce the spread of the disease, particularly when used universally within communities. There is increasing evidence that cloth face coverings help prevent people who have COVID-19 from spreading the virus to others.

"We are not defenseless against COVID-19," said CDC Director Dr. Robert R. Redfield. "Cloth face coverings are one of the most powerful weapons we have to slow and stop the spread of the virus – particularly when used universally within a community setting. All Americans have a responsibility to protect themselves, their families, and their communities."

This review included two case studies out today, one from JAMA, showing that adherence to universal masking policies reduced SARS-CoV-2 transmission within a Boston hospital system, and one from CDC's Morbidity and Mortality Weekly Report (MMWR), showing that wearing a mask prevented the spread of infection from two hair stylists to their customers in Missouri.

Additional data in today's MMWR showed that immediately after the White House Coronavirus Task Force and CDC advised Americans to wear cloth face coverings when leaving home, the proportion of U.S. adults who chose to do so increased, with 3 in 4 reporting they had adopted the recommendation in a national internet survey.

The results of the Missouri case study provide further evidence on the benefits of wearing a cloth face covering. The investigation focused on two hair stylists — infected with and having symptoms of COVID-19 — whose salon policy followed a local ordinance requiring cloth face coverings for all employees and patrons. The investigators found that none of the stylists' 139 clients or secondary contacts became ill, and all 67 clients who volunteered to be tested showed no sign of infection.

The finding adds to a growing body of evidence that cloth face coverings provide source control – that is, they help prevent the person wearing the mask from spreading COVID-19 to others. The main protection individuals gain from masking occurs when others in their communities also wear face coverings.

**COVID-19 prevention in a Missouri hair salon**

When two stylists at a Missouri hair salon tested positive for the virus that causes COVID-19, researchers from CoxHealth hospitals, Washington University, the University of Kansas, and the Springfield-Greene County Health

Exhibit 8
032

Department worked together to trace contacts, investigate the cases, and publish their findings in the MMWR.

One of the stylists developed respiratory symptoms but continued to see clients for eight days. The other, who apparently became infected from her co-worker, also developed respiratory symptoms and continued to see clients for four days.

The salon in which they worked had a policy requiring both stylists and their clients to wear face coverings, consistent with the local government ordinance. Both stylists wore double-layered cloth face coverings or surgical masks when seeing clients. The median appointment time was 15 minutes and ranged from 15 to 45 minutes. More than 98% of clients wore a face covering—47% wore cloth face coverings, 46% wore surgical masks, and about 5% wore N-95 respirators.

When customers were asked whether they had been ill with any respiratory symptoms in the 90 days preceding their appointment, 87 (84%) reported that they had not. None of the interviewed customers developed symptoms of illness. Among 67 (48%) customers who volunteered to be tested, all 67 tested negative for the virus that causes COVID-19. Several family members of one of the stylist's subsequently developed symptoms and received a diagnosis of COVID-19.

### Survey: Acceptance of face-mask guidance increased

CDC analyzed data from an internet survey of a national sample of 503 adults during April 7–9 and found that about 62% said they would follow the newly announced recommendations to wear a face mask when outside the home. A repeat survey during May 11-13 showed that the percentage of adults endorsing face mask wearing increased to more than 76%.

The increase was driven largely by a significant jump in approval by white, non-Hispanic adults, from 54% to 75%. Approval among Black, non-Hispanic adults went up from 74% to 82%, and remained stable among Hispanic/Latino adults at 76% and 77%.

There was also a large increase in face-mask approval among respondents in the Midwest, from 44% to 74%. Approval was greatest in the Northeast, going from 77% to 87%.

Resources:

- CDC's Information on Cloth Face Coverings: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html
- CDC Editorial in JAMA: Brooks JT, Butler JC, Redfield RR. Time for universal masking and prevention of transmission of SARS-CoV-2. JAMA. Published online July 14, 2020. doi:10.1001/jama.2020.13107 https://jamanetwork.com/journals/jama/fullarticle/10.1001/jama.2020.13107 ⧉
- MMWR Article: No Transmission of Symptomatic SARS-CoV-2 After Significant Exposure With Universal Face Mask Use at a Hair Salon – Springfield, Missouri, May 2020 https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e2.htm?s_cid=mm6928e2_w

MMWR Article: Factors Associated with Cloth Face Coverings Use during the COVID-19 Pandemic — United States, April and May 2020 https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e3.htm?s_cid=mm6928e3_w

###
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ⧉

*CDC works 24/7 protecting America's health, safety and security. Whether disease start at home or abroad, are curable or preventable, chronic or acute, or from human activity or deliberate attack, CDC responds to America's most*

Exhibit 8
033

Exhibit 9

# Goldman Sachs | Insights - Face Masks and GDP

New US coronavirus cases have risen sharply in recent weeks, leading investors to worry that renewed lockdowns will again depress economic activity. But since the first infection wave in March and April, it has become clear that broad lockdowns are not the only way to lower virus transmission, and many governments have started to require the wearing of face masks in public settings. Should the United States follow suit with a national mandate? This is inherently a political decision, but we can use our analytical tools to answer three questions that are relevant to it. First, how effective is a face mask mandate in increasing face mask usage? Second, does increased face mask usage lower virus transmission, and if so by how much? And third, how economically valuable is a face mask mandate in terms of reducing the need for broad lockdowns with their well-documented negative effects on GDP?

---

**VIEW VIDEO**: Jan Hatzius, head of Goldman Sachs Research and the firm's chief economist, explores the link between face masks and coronavirus outcomes, and the economic value of a national face mask mandate in reducing the need for broad lockdowns.

---

- The sharp increase in confirmed coronavirus cases in the US Sun Belt has led investors to worry about renewed broad lockdowns with large negative effects on GDP. But there are also other ways to reduce infections, including stringent bans on large gatherings and greater use of face masks.
- In particular, we argue that a national face mask mandate could partially substitute for renewed lockdowns. We start by showing that a national mandate would likely increase face mask usage meaningfully, especially in states such as Florida and Texas where masks remain largely voluntary to date.
- We then investigate the link between face masks and coronavirus outcomes. Our analysis includes 1) a US regional panel in which we relate the growth rate of infections and fatalities to the introduction of state face mask mandates, 2) a large country-level cross section in which we relate cumulative infections and fatalities to the lag between the onset of spread and the introduction of a face mask mandate, and 3) a smaller country-level panel in which we relate the growth rate of infections and fatalities to lagged mask usage.
- We find that face masks are associated with significantly better coronavirus outcomes. Since this is true across all three of our models and the results are robust to the inclusion of a number of control variables, it seems to reflect a largely causal impact of masks rather than correlation with other factors (such as reduced mobility or avoidance of large gatherings). Our baseline estimate is that a national mandate could raise the percentage of people who wear masks by 15pp and cut the daily growth rate of confirmed cases by 1.0pp to 0.6%.
- Finally, we translate our results into GDP terms by asking how much our Effective Lockdown Index (ELI) would need to increase in order to cut infections by as much as a national mask mandate, and then converting the ELI impact into a GDP impact using the estimated cross-country relationship between the two. These calculations imply that a face mask mandate could potentially substitute for lockdowns that would otherwise subtract nearly 5% from GDP.

# Face Masks and GDP [1]

---

New US coronavirus cases have risen sharply in recent weeks, with most of the deterioration concentrated in the "Sun Belt," including Florida, Texas, Arizona, and California. This has led investors to worry that renewed lockdowns will again depress economic activity. By our estimates, the increase in our Effective Lockdown Index (ELI)—a combination of official restrictions and actual social distancing data—subtracted 17% from US GDP between January and April, and other countries with even more aggressive restrictions saw even larger economic effects.

Since the first infection wave in March and April, however, it has become clear that broad lockdowns are not the only way to lower virus transmission significantly. For one thing, public health experts have long believed that bans on large gatherings can bring disproportionate benefits. This belief has only grown with a multitude of studies documenting the importance of "super spreader" events, such as those associated with the Shinjeonji Church in South Korea, the Austrian ski resort Ischgl, various European soccer matches, and the celebrations in New Orleans for Mardi Gras.

A more abrupt shift has occurred in the official view on face masks. As late as March 30, the World Health Organization advised that there was "no specific evidence to suggest that the wearing of masks by the mass

Exhibit 9
034

population has any potential benefit."[2] Since then, however, the public health community's thinking has changed dramatically and many governments have started to require the wearing of face masks.

Should the United States follow these countries and adopt a national face mask mandate? This is inherently a political decision, but we can use our analytical tools to answer three questions that are relevant to it. First, how effective is a face mask mandate in increasing face mask usage? Second, does increased face mask usage lower virus transmission, and if so by how much? And third, how economically valuable is a face mask mandate in terms of reducing the need for broad lockdowns with their well-documented negative effects on GDP?

## Face Mask Mandates and Usage

At present, the United States is among the less restrictive countries with respect to face mask mandates. The federal government did issue a national "recommendation" to wear masks in public settings in April, and many state and local governments have taken more stringent measures. However, a recommendation is not a mandate and the governors of both Florida and Texas—the two most heavily affected large states—recently reiterated their opposition to a statewide mask mandate. By contrast, many European countries now have national mask mandates in place, as shown in Exhibit 1, and much of East Asia has strong social norms of mask wearing when sick and during pandemics.

**Exhibit 1: The US Is Among the Less Restrictive Economies with Respect to Face Mask Mandates**

| Economy | Region | Mask Policy* | Policy Details* | Date Implemented* |
|---|---|---|---|---|
| China | East Asia | National Norm/Universal Mask Usage | | |
| Hong Kong | East Asia | National Norm/Universal Mask Usage | | |
| South Korea | East Asia | National Norm/Universal Mask Usage | | |
| Japan | East Asia | National Norm/Universal Mask Usage | | |
| Singapore | Southeast Asia | National Mandate | Everywhere in Public | 14-Apr-20 |
| Germany | Europe | National Mandate | Public Transport & Stores | 27-Apr-20 |
| India | South Asia | National Mandate | Everywhere in Public | 1-May-20 |
| Italy | Europe | National Mandate | Public Transport & Stores | 4-May-20 |
| France | Europe | National Mandate | Public Transport & Schools & Stores | 11-May-20 |
| Mexico | Americas | National Mandate | Public Transport | 20-May-20 |
| UK | Europe | National Mandate | Public Transport | 15-Jun-20 |
| Spain | Europe | National Mandate | Public Transport & Stores | 21-Jun-20 |
| Brazil | Americas | Regional Mandate | Belo Horizonte, Federal District, Rio Grande do Sul, Rio de Janeiro, Salvador*** | |
| Russia | Central Asia | Regional Mandate | Moscow, St. Petersburg*** | |
| US | Americas | Regional Mandate | CA, CT, DE, DC, HI, IL, KY, ME, MD, MA, MI, NV, NJ, NM, NY, NC, PA, RI, UT, VA, WA | |
| Switzerland | Europe | National Recommendation | Public Transport & Stores | 22-Apr-20 |
| Canada | Americas | National Recommendation | Public Settings** | 20-May-20 |
| Australia | Oceania | None | | |
| New Zealand | Oceania | None | | |
| Norway | Scandinavia | None | | |
| Sweden | Scandinavia | None | | |

\* Based on information on MASKS4ALL Website (https://masks4all.co) and Leffler et al. (2020) study.
\*\* Where social distancing is not possible.
\*\*\* List not exhaustive.

Source: masks4all.co, Leffler et al. 2020, Goldman Sachs Global Investment Research

What about actual mask usage? In this respect, the US scores somewhat better than one might expect, at least when looking at the national self-reported average. As shown in Exhibit 2, the share of respondents saying that they wear a face mask in public is nearly 90% in East Asia, 80% in Southern Europe, just below 70% in the US and Germany, 30% in the UK, and as low as 10% in Scandinavia. Most countries, including the US, have seen large increases in self-reported mask usage since the start of the pandemic.

Exhibit 9
035

**Exhibit 2: The Percentage of People Saying That They Wear a Face Mask in Public Ranges from Less than 10% in Scandinavia to Nearly 90% in East Asia**



Source: YouGov, Goldman Sachs Global Investment Research

However, the national data don't tell the full story. As shown in Exhibit 3, face mask usage is highest in the Northeast, where the virus situation has improved dramatically in recent months, and generally lower in the South, where the numbers have deteriorated.[3] For example, only about 40% of respondents in Arizona say that they "always" wear face masks in public, compared with nearly 80% in Massachusetts.

Exhibit 9
036



Exhibit 3: The Share "Always" Wearing a Face Mask in Public Ranges from Around 40% in Minnesota and Arizona to 80% in Massachusetts

Source: YouGov, Goldman Sachs Global Investment Research

How effective would a national mask mandate be in pushing mask usage to Southern European or East Asian levels? To investigate this, we turn to a statistical event study that relates the adoption of mask mandates across US states to subsequent changes in self-reported mask usage.

We analyze the impact of face mask mandates issued by 20 US states plus DC between April 8 and June 24 in a state panel. We collect the announcement dates of mask mandates from a study in Health Affairs by Wei Lyu and George Wehby and construct statewide time series of face mask usage outside the home using YouGov Covid-19 Behaviour Tracker respondent-level data. We regress state-level mask usage on various event time dummies around the announcement and include state fixed effects and time fixed effects.[4]

Exhibit 4 shows our estimates of a large and highly significant impact of mandates on mask usage. We estimate that statewide mask mandates gradually raise the percentage of people who "always" or "frequently" wear masks by around 25pp in the 30+ days after signing (left panel). The percent of respondents who "always" wear masks rises by nearly 40pp 30+ days after, reflecting some people switching from "frequently" and other categories to "always" (right panel).



Exhibit 4: Mask Mandates Raise the Percentage of People Who "Always" or "Frequently" Wear Masks by Around 25pp in the 30+ Days After Signing

Source: YouGov, Goldman Sachs Global Investment Research

Exhibit 4 suggests that a national mask mandate could increase US face mask usage by statistically

Exhibit 9
037

significant and economically large amounts, especially in states such as Florida and Texas that currently don't have a comprehensive mandate and are seeing some of the worst outbreaks. Specifically, we estimate that a national mandate would increase the national average share of people who "always" or "frequently" wear masks by 15pp. This estimate is based on two assumptions. First, we assume that states that currently don't have a mandate—which account for 50% of the population—experience a 25pp rise in mask usage in line with the average response to statewide mandates. Second, we assume that states which already have a state mandate see a 5pp increase in mask usage because of increased focus on the issue.

## Face Masks and Virus Outcomes

**Approach 1: US County Panel**
Does increased face mask usage lower virus transmission, and if so by how much? To investigate this, we turn to three statistical approaches relating face mask usage and mandates to virus spread and fatalities.

Our first approach extends our event study analysis of US state-level mandates to the impact on the growth rate of infections and fatalities. Specifically, we regress county-level growth rates of infections and fatalities on event time dummies around the announcement and control for state fixed effects, time fixed effects, and a rich set of county-level controls.[5]

As shown in Exhibit 5, we estimate that face mask mandates have large and highly statistically significant effects on health outcomes. Our estimates imply that mask mandates lower the infection growth rate by 1.3pp in the 11-15 days after announcement. Relative to the 5.4% average infection growth rate prior to announcement, the growth rate of infections is cut by 25%. We also estimate significant and somewhat larger declines in the growth rate of COVID-19 fatalities of 2.4pp in the 11-15 days after announcement and of 3.7pp in the 21-29 days after.

Exhibit 9
038

**Exhibit 5: Mask Mandates Are Associated with Large Declines in COVID-19 Case and Fatality Growth**





Source: YouGov, Goldman Sachs Global Investment Research

**Approach 2: Large Country Cross-Section**

Our second approach is a large country cross section in which we relate cumulative case counts and fatalities to the lag between the onset of spread and the introduction of a face mask mandate, building on a study by Christopher Leffler and co-authors.

Exhibit 6 presents the descriptive relationships graphically by plotting the length of the outbreak before masks were widely adopted against cumulative cases per capita (left panel) and cumulative fatalities per capita (right panel). We measure the start of the outbreak as the day of the first fatality. Both graphs show a positive and statistically significant slope, indicating that countries which took longer to reach widespread mask usage (whether by policy or cultural norms) suffered more virus cases and fatalities. The better fit for fatalities than cases likely reflects the relatively better measurement of fatalities.

Exhibit 9
039

6 of 10      7/21/2020, 1:53 PM

**Exhibit 6: Countries Which Took Longer to Reach Widespread Mask Usage Experienced More COVID-19 Cases and Fatalities**



Source: masks4all.co, Leffler et al. 2020, Goldman Sachs Global Investment Research

To formalize this finding, Exhibit 7 presents cross-sectional regression models of log cases and log fatalities for around 125 countries. In both regressions, we find statistically significant negative effects of masks on cumulative cases and fatalities after including controls such as the obesity rate, population density, age structure, and testing policy. Our numerical estimates are that cumulative cases grow 17.3% per week without a mask mandate but only 7.3% with a mask mandate, and that cumulative fatalities grow 29% per week without a mask mandate but only 16% with a mask mandate.

**Exhibit 7: Mask Policies and Norms Have Lowered COVID-19 Case Counts and Fatalities**

| | Country Cross-Section: Impact of Mask Wearing on COVID-19* | | | |
|---|---|---|---|---|
| | Log COVID-19 Cumulative Cases per Capita | | Log COVID-19 Fatalities per Capita | |
| | Coefficient [t-stat] | 10^coefficient | Coefficient [t-stat] | 10^coefficient |
| Intercept | -4.896*** [-18.07] | -- | -6.953*** [-23.46] | -- |
| Weeks of Infection | 0.069*** [3.22] | 1.173 | 0.109*** [4.27] | 1.285 |
| Weeks of Infection with Mask Mandate/Norm** | -0.039*** [-3.34] | 0.915 | -0.044*** [-3.09] | 0.904 |
| Obesity Rate (%) | 0.039*** [6.53] | 1.093 | 0.031*** [4.77] | 1.074 |
| Population Density*** | 0.181*** [2.73] | 1.519 | | |
| Testing Policy**** | 0.570*** [4.49] | 3.712 | | |
| % of Population Over 65 | | | 0.034*** [3.74] | 1.081 |
| Observations | 121 | | 131 | |
| R-squared | 0.49 | | 0.49 | |

*Data as of 23 June.

**Calculated upto 28 days before June 23 for Fatalities and 14 days before June 23 for Cases.

***1000 people per square km of land area.

****Proportion of time testing available to anyone showing COVID-19 symptoms (based on Oxford COVID-19 Testing Policy Indicator) from 10 days before first fatality to 14 days before 23 June.

Source: World Bank, Blavatnik School of Government: Oxford, Leffler et al. 2020, Masks4all.co, Goldman Sachs Global Investment Research

**Approach 3: Country Panel**
Our third approach consists of a smaller country panel in which we relate the daily growth rate of infections and fatalities to lagged self-reported mask usage, plus a number of control variables. There are three main results, illustrated in Exhibit 8.

First, face masks have a large negative impact on infections and fatalities, controlling for population density and income inequality (columns 1 and 4). This negative and significant impact of face masks is robust to

Exhibit 9
040

controlling for our Effective Lockdown Index (ELI), the share of the population that say they avoid crowded public places (columns 2 and 5), and country and time fixed effects (columns 3 and 6). Our estimates suggest that a 25pp increase in the self-reported mask usage, for instance as a result of a mask mandate, lowers the growth rate of cumulative cases by 1.9pp and the growth rate of cumulative fatalities by 0.8pp.[6]

Second, the share of respondents that avoid crowded public places also has a large and highly significant negative impact on infections and fatalities. This not only suggests a significant role for "super spreader" events, but also strengthens our main results because it implies that the face mask result is not just driven by the correlation between face masks and other risky activities.

Third, the virus impact of mask usage is large, not just in absolute terms but also relative to the effect of economically costly shutdowns (as measured by our ELI). In fact, the coefficients on the percentage of self-reported mask usage are slightly bigger than those on the ELI, which is interesting as both variables are on a 0-100 scale.

**Exhibit 8: Face Masks and Limiting Mass Gathering Lower COVID-19 Case and Fatality Growth**

| | International Panel: Impact of Mask Wearing on COVID-19 Spread | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Growth Rate of Confirmed Cases per Million* | | | Daily Growth Rate of Fatalities per Million* | | |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Intercept | -12.37 | 4.29 | 8.05 | -6.80 | 4.56 | 2.32 |
| | [-3.83]*** | [0.68] | [1.27] | [-3.77]*** | [1.43] | [1.06] |
| % of Pop. Wearing Maks in Public, Lagged** | -0.11 | -0.07 | -0.08 | -0.06 | -0.03 | -0.03 |
| | [-5.2]*** | [-3.21]*** | [-3.63]*** | [-5.05]*** | [-2.00]** | [-2.19]** |
| GS Effective Lockdown Index, Lagged** | | -0.05 | -0.07 | | -0.04 | -0.04 |
| | | [-1.59] | [-3.00]*** | | [-1.94]* | [-2.28]** |
| % of Pop. Avoiding Crowded Public Places, Lagged** | | -0.23 | -0.15 | | -0.15 | -0.11 |
| | | [-3.11]*** | [-2.39]** | | [-4.79]*** | [-2.30]** |
| Income Inequality | 0.54 | 0.57 | 1.10 | 0.32 | 0.32 | 0.43 |
| | [4.96]*** | [5.76]*** | [2.63]*** | [5.98]*** | [5.71]*** | [2.59]*** |
| Population Density | 0.01 | 0.01 | 0.02 | 0.01 | 0.01 | 0.01 |
| | [3.83]*** | [3.05]*** | [2.89]*** | [3.03]*** | [2.31]** | [3.74]*** |
| Time FEs | No | No | Yes | No | No | Yes |
| Country FEs | No | No | Yes | No | No | Yes |
| Num. of Countries | 22 | 18 | 18 | 22 | 18 | 18 |
| Observations | 2086 | 1743 | 1743 | 1711 | 1491 | 1491 |
| R-squared | 0.19 | 0.43 | 0.69 | 0.11 | 0.29 | 0.51 |

Note: T-statistics in brackets and robust standard errors clustered by country.

* Growth rates are natural log differences*100.

** Lagged 14 days for cases per million regressions; lagged 28 days for fatalities per million regressions.

Source: JHU CSSE, YoGov, Goldman Sachs Global Investment Research

## The Impact of a Mandate on Infections

Before we translate our statistical results into a baseline estimate of the impact of face mask mandates on virus outcomes, we need to address two potential concerns about our analysis up front.

The first concern is that the correlation between face masks and virus outcomes might reflect the effect of other unobserved forms of cautious behavior that are correlated with mask mandates or usage, instead of a truly causal effect of masks. But there are some reasons to believe that this type of bias in not a big issue for our analysis. Not only do we obtain remarkably similar estimates across our three approaches, but we also control for a number of other observable forms of cautious behavior. Specifically, our cross-country results on masks include our Effective Lockdown Index among the explanatory variables, and they are largely unchanged when we include the share of respondents who say they stay home from work, don't touch objects, improve personal hygiene, avoid contact with tourists, avoid raw meat, and don't send their children to school.[7]

The second potential concern is that our main results are based on confirmed infections, which can be distorted by a lack of testing. However, it is important to note that this would, if anything, lead to an understatement of the effect assuming that increases in testing are positively correlated with increases in mask usage. Moreover, we control for testing regime indicators in our cross-sectional regression, and we

Exhibit 9
041

obtain generally similar estimates for fatalities—which are better measured—across all three of our approaches.

So what is a reasonable baseline estimate of the impact of a US national mask mandate on the growth rate of confirmed infections? To generate such an estimate, we apply our country panel results separately to two groups of US states, namely ones with and without a state-level mask mandate in place.

States that currently don't have a state-level mandate account for 40% of US total confirmed cases, 45% of US GDP, half of the population, and two-thirds of new infections. This group has also experienced an average daily growth rate in confirmed infections of 2.9% in the past 7 days. Based on our analysis of state-level mandates, we estimate that a national mask mandate would raise mask usage by 25pp in these states. Our country panel shows that a 25pp increase in self-reported mask usage lowers the infection growth rate by 1.9pp (or just over 60%). The national mandate could therefore lower the daily growth rate in the group of states without a mandate from 2.9% to just over 1%.

States that currently do have a mandate have experienced a lower average daily growth rate in confirmed infections of 0.8% in the past 7 days. Combined with our assumption that a national mandate would lead to a smaller increase in mask usage of 5pp through extra awareness in this group of states, our country panel suggests a 0.4pp decline in the infection growth rate to 0.4-0.5%.

Combining the estimates for these two groups of states, we estimate that a national mandate could cut the national average growth rate of infections by nearly 1.0pp to 0.6-0.7%.

### The Impact of a Mandate on GDP

If a face mask mandate meaningfully lowers coronavirus infections, it could be valuable not only from a public health perspective but also from an economic perspective because it could substitute for renewed lockdowns that would otherwise hit GDP.

How big is this potential effect? To generate an answer, we proceed in two steps. First, we use our cross-country panel analysis to ask how much our effective lockdown index (ELI) would need to increase in order to lower the daily case growth rate by 1.0pp, i.e. the estimated impact of a national face mask mandate. The answer is an increase in our ELI of 16pp.

Second, we ask how much a 16pp ELI increase would subtract from the level of GDP. As shown in Exhibit 9, the cross-country relationship implies that such an increase might reduce GDP by just under 5%.



**Exhibit 9: A Close Relationship Between the ELI and GDP**

Note: Impact on real activity is estimated where data is not available.

References to China are to Mainland China

Source: Goldman Sachs Global Investment Research

Thus, the upshot of our analysis is that a national face mask mandate could potentially substitute for renewed lockdowns that would otherwise subtract nearly 5% from GDP. It is important to recognize that this estimate is quite uncertain because it is based on a number of statistical relationships that are all measured with error. Despite the numerical uncertainty, however, our analysis suggests that the economic benefit from a face mask mandate and increased face mask usage could be sizable.

Exhibit 9
042

So will the US adopt a national face mask mandate? This is uncertain, partly because masks have become such a politically and culturally charged issue. However, even in the absence of a national mandate, state and local authorities might well broaden mandates in ways that ultimately mimic the impact of a national mandate. Either way, our analysis suggests that the economy could benefit significantly from such moves, especially when compared with the alternative of a return to broader lockdowns.

**Jan Hatzius**

**Daan Struyven**

**Isabella Rosenberg**

---

[1] **We thank Sid Bhushan and Dan Milo for valuable help with this report.**

[2] **See Jaqueline Howard, "WHO stands by recommendation to not wear masks if you are not sick," CNN, March 30, 2020.**

[3] **As an aside, note that Minnesota has the lowest self-reported rate of mask usage among larger states in the US. This is interesting because the state is home to a large population of Scandinavian-Americans and Scandinavia has some of the lowest rates of face mask usage in the world.**

[4] **Our mask usage regressions are weighted by state population, focus on states with more than 4 million people (given the small samples in the respondent-level data) and use robust standard errors at the state level. Our sample starts on April 2nd when respondent-level data become available. We also control for cumulative cases per million and cumulative deaths per million.**

[5] **The county-level controls are population density, median house value, median household income, homeownership, pollution, maximum summer temperature, and maximum winter temperature, educational attainment, mean Body Mass Index, and the share of population over 65. We use county population weights and cluster robust standard errors at the state level. Our sample covers 2,373 counties and extends from March 31 to June 24. See Lyu and Wehby (2020).**

[6] **Relative to the sample average growth rates of 3.8% and 2.8%, these estimates imply that a mask mandate raising mask usage by 25pp cuts the growth rates of infections and fatalities by nearly one half and one quarter respectively.**

[7] **The cross-country panel and cross-county panel results are also robust to controlling for the lagged levels of fatalities and infections per capita, which helps address the concern that the mask effects pick up the impact of other forms of unobserved cautious behavior in response to the size of the outbreak.**

Investors should consider this report as only a single factor in making their investment decision. For Reg AC certification and other important disclosures, see the Disclosure Appendix, or go to www.gs.com/research/hedge.html.

Exhibit 9
043

Exhibit 10

BREAKING   |   508,337 views   |   Jun 30, 2020, 09:51am EDT

# A National Mask Mandate Could Save The U.S. Economy $1 Trillion, Goldman Sachs Says



**Sarah Hansen** Forbes Staff

Markets

*I cover breaking news.*

Updated Jun 30, 2020, 10:24pm EDT

**TOPLINE**  As mask-wearing becomes a political flashpoint—despite coronavirus cases spiking to record levels across the country—new research from Goldman Sachs suggests a national mask mandate would slow the growth rate of new coronavirus infections and prevent a 5% GDP loss caused by additional lockdown measures.



Presumptive Democratic presidential candidate former vice president Joe Biden dons a mask after

Exhibit 10

044

... [+]   GETTY IMAGES

**KEY FACTS**

- Goldman's analysts found that wearing face coverings has a significant impact on coronavirus outcomes, and they suggest that a federal mask mandate would "meaningfully" increase mask usage across the country, especially in states like Florida and Texas, where masks are not currently required.

- The researchers estimate that a national mandate would increase the portion of people wearing masks by 15 percentage points, and cut the daily growth of new cases by 1.0 percentage point to 0.6%.

- Reducing the spread of the virus through mask-wearing, the analysts found, could be a substitute for strict lockdown measures that would otherwise shave 5%—or $1 trillion—off the U.S. GDP.

**CRUCIAL QUOTE**

"If a face mask mandate meaningfully lowers coronavirus infections, it could be valuable not only from a public health perspective but also from an economic perspective because it could substitute for renewed lockdowns that would otherwise hit GDP," the researchers wrote.

**KEY BACKGROUND**

As coronavirus cases rise to record levels, prompting some states to pause or walk back their reopening plans, many lawmakers have called for a national mask mandate. Presumptive presidential nominee Joe Biden said that if he's elected, he would use federal power to require all Americans to wear masks in public places. House Speaker Nancy Pelosi has also voiced her support for the practice: "Real men wear masks," she said earlier this month. New York Gov. Andrew Cuomo has also called for an executive order mandating that everyone wear masks in public, suggesting that President Trump—who has downplayed the importance of masks and

Cookies on Forbes

Exhibit 10
045

dismissed suggestions that he wear one—should lead by example.

**FURTHER READING**

Top Democrats Push For Nationwide Mask Mandate, Trump Pushes Back *(Forbes)*

Mask Wars: As Mandates Grow—And Coronavirus Cases Surge—Some Conservatives Push Back *(Forbes)*

Masks Help Stop The Spread Of Coronavirus, Studies Say—But Wearing Them Still A Political Issue *(Forbes)*

Tired Of Wearing A Face Mask In Public? New Research Underscores Why You Still Need To *(Forbes)*

## The Evolving Role of Finance Chiefs

Sign up for The Balance Sheet, Forbes' biweekly newsletter from CFO Network Editor Ezequiel Minaya.

| Enter e-mail address | Sign up |
| --- | --- |

You may opt out any time. Terms and Conditions and Privacy Policy

*Follow me on Twitter. Send me a secure tip.*



**Sarah Hansen**

Follow

I'm a breaking news reporter for Forbes focusing on capital markets and finance. I completed my master's degree in business and economic reporting at New York...

**Read More**

| Site Feedback | Tips | Corrections | Reprints & Permissions | Terms | Privacy |
| --- | --- | --- | --- | --- | --- |

© 2020 Forbes Media LLC. All Rights Reserved.    AdChoices

ADVERTISEMENT

Exhibit 10
046

Exhibit 11

# California Department of Public Health

**Contact :**

Office of Public Affairs

(916) 440-7259

**California Public Health Officials**
**Release Guidance Requiring Californians to Wear Face Coverings in**
**Most Settings Outside the Home**

Date: June 18, 2020
Number: NR20-128
Contact: CDPHpress@cdph.ca.gov

*Californians Must Wear Face Coverings*

*When in Higher-Risk Situations, Especially Indoors*

*Face Coverings Help Reduce the Spread of COVID-19*

*Governor Newsom: "Simply put, we are seeing too many people with faces uncovered – putting at risk the real progress we have made in fighting the disease."*

SACRAMENTO – The California Department of Public Health today released updated PDF guidance that requires Californians to wear a face covering in high-risk settings. A growing body of scientific research has shown that people with no or few symptoms of COVID-19 can still spread the disease and that the use of face coverings, combined with physical distancing and frequent hand washing, will reduce the spread of COVID-19.

"Science shows that face coverings and masks work," said Governor Gavin Newsom. "They are critical to keeping those who are around you safe, keeping businesses open and restarting our economy."

Governor Newsom also addressed why he took this action now. "Simply put, we are seeing too many people with faces uncovered – putting at risk the real progress we have made in fighting the disease. California's strategy to restart the economy and get people back to work will only be successful if people act safely and follow health recommendations. That means wearing a face covering, washing your hands and practicing physical distancing."

"As Californians venture into our communities more, wearing face coverings is another important way we can help protect one another," said Dr. Sonia Angell, State Public Health Officer and Director of the California Department of Public Health. "Combined with physical distancing and frequent hand washing, wearing

Exhibit 11
047

cloth face coverings when we are with others outside of our household will reduce the spread of COVID-19, which is still a very real threat across our state."

Today's guidance mandates the use of cloth face coverings by the general public statewide when outside the home, with limited exceptions.

**Californians must wear face coverings when they are in the situations listed below:**

- Inside of, or in line to enter, any indoor public space;

- Obtaining services from the healthcare sector in settings including, but not limited to, a hospital, pharmacy, medical clinic, laboratory, physician or dental office, veterinary clinic, or blood bank;

- Waiting for or riding on public transportation or paratransit or while in a taxi, private car service, or ride-sharing vehicle;

- Engaged in work, whether at the workplace or performing work off-site, when:

  - Interacting in-person with any member of the public;

  - Working in any space visited by members of the public, regardless of whether anyone from the public is present at the time;

  - Working in any space where food is prepared or packaged for sale or distribution to others;

  - Working in or walking through common areas, such as hallways, stairways, elevators, and parking facilities;

  - In any room or enclosed area where other people (except for members of the person's own household or residence) are present when unable to physically distance.

- Driving or operating any public transportation or paratransit vehicle, taxi, or private car service or ride-sharing vehicle when passengers are present. When no passengers are present, face coverings are strongly recommended.

- While outdoors in public spaces when maintaining a physical distance of six feet from persons who are not members of the same household or residence is not feasible.

**The following individuals are exempt from wearing a face covering:**

- Children aged two and under;
- Persons with a medical, mental health, or developmental disability that prevents wearing a face covering;
- Persons who are hearing impaired, or communicating with a person who is hearing impaired, where the ability to see the mouth is essential for communication;
- Persons for whom wearing a face covering would create a risk to the person related to their work, as determined by local, state, or federal regulators or workplace safety guidelines.
- Persons who are obtaining a service involving the nose or face for which

Exhibit 11
048

temporary removal of the face covering is necessary to perform the service;

- Persons who are seated at a restaurant or other establishment that offers food or beverage service, while they are eating or drinking, provided that they are able to maintain a distance of at least six feet away from persons who are not members of the same household or residence;

- Persons who are engaged in outdoor work or recreation such as swimming, walking, hiking, bicycling, or running, when alone or with household members, and when they are able to maintain a distance of at least six feet from others;

- Persons who are incarcerated. Prisons and jails, as part of their mitigation plans, will have specific guidance on the wearing of face coverings of masks for both inmates and staff.

More information about the state's COVID-19 guidance is on the California Department of Public Health's Guidance web page.

More information about reopening California and what individuals can do to prevent the spread of COVID-19, visit Coronavirus (COVID-19) in California.

Page Last Updated : June 18, 2020

Exhibit 11
049

Exhibit 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-1138 JGB (KKx)** | Date | June 23, 2020 |
|---|---|---|---|
| Title | *PCG-SP Venture I LLC v. Gavin Newsom, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):    Attorney(s) Present for Defendant(s):

None Present    None Present

**Proceedings:    Order DENYING Plaintiff's Emergency Application for Temporary Restraining Order (IN CHAMBERS)**

Before the Court is an Emergency Application for Temporary Restraining Order filed by Plaintiff PCG-SP Venture I LLC ("Plaintiff" or "V Palm Springs Hotel"). ("Application," Dkt. No. 8.) The Court held a hearing on the Application on June 16, 2020. After considering the papers filed in support of and in opposition to the Application and argument presented at the hearing, the Court DENIES the Application.

## I.    BACKGROUND

On June 2, 2020, Plaintiff filed its complaint against Defendants Gavin Newsom, Xavier Becerra, and Sonia Y. Angell (collectively, "Defendants"). ("Complaint," Dkt. No. 1.) The Complaint alleges nine causes of action: (1) violations of the Dormant Commerce Clause; (2) violations of the Due Process Clause of the Fourteenth Amendment; (3) violations of the Equal Protection Clause of the Fourteenth Amendment; (4) violations of the Takings Clause of the Fifth Amendment; (5) violations of the California Constitution, Article I, § 1; (6) violations of the California Constitution, Article I, § 7; (7) violations of the California Constitution, Article I, § 19; (8) violations of California Government Code § 8572; and (9) failure to provide just compensation under the California Code. (Id.)

Plaintiff filed the Application on June 4, 2020. (See Application.) In support of the Application, Plaintiff filed:

- Memorandum of points and authorities ("Memo," Dkt. No. 8-1);

---

Page 1 of 17          **CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

Exhibit 12
050

- Declaration of Gregg Grossman ("Grossman Declaration," Dkt. No. 8-2 (attaching "Exhibit D," id. at 5–8));
- Declaration of Mark Meuser ("Meuser Declaration," Dkt. No. 8-3); and
- Proposed order (Dkt. No. 8-4).

Defendants opposed the Application on June 9, 2020. ("Opposition," Dkt. No. 13.) In support of the Application, Defendants filed the Declaration of James Watt ("Watt Declaration," Dkt. No. 13-1 (attaching "Exhibits A–C," id. at 9–32) and a request for judicial notice ("DRJN," Dkt. No. 14 (attaching "Exhibits 1–12," id. at 5–119)).

On June 15, 2020, both parties submitted additional requests for judicial notice. ("2d DRJN," Dkt. No. 16 (attaching "Exhibits 13–14," id. at 4–9); "PRJN," Dkt. No. 17 (attaching "Exhibit D," id. at 4–6).)

On June 16, 2020, the Court held a telephonic hearing on the Application.

## II.   REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of fourteen exhibits filed with the Opposition. (See DRJN; 2d DRJN; Exhibits 1–14.) Plaintiff also requests that the Court take judicial notice of one exhibit. (See PRJN; Exhibit D.) A court may take judicial notice of an adjudicative fact not subject to "reasonable dispute," either because it is "generally known within the territorial jurisdiction of the trial court," or it is capable of accurate and ready determination by resort to sources whose "accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Under Federal Rule of Evidence 201, "[a] court must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Exhibits 1–11 and Exhibits 13–14 depict publicly available information accessible on government websites maintained by the state of California and County of Riverside. "Under Rule 201, the court can take judicial notice of [p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." U.S. ex rel. Modglin v. DJO Glob. Inc., 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014), aff'd sub nom. United States v. DJO Glob., Inc., 678 F. App'x 594 (9th Cir. 2017) (internal quotations omitted). Exhibit 12 depicts a copy of Judge R. Gary Klausner's June 8, 2020 order denying a request for a temporary restraining order in Professional Beauty Fed'n of Calif. v. Newsom, et al., U.S.D.C, C.D. Cal., No. 2:20-cv-04275-RGK-AS ("Professional Beauty"). Exhibit D reflects a copy of an order issued in the Sutter County Superior Court granting a request for a temporary restraining order. Courts may "take notice of proceedings in other courts… if those proceedings have a direct relation to matters at issue." U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992). Thus, judicial notice of Exhibits 1–14 and Exhibit D is appropriate. The Court GRANTS the DRJN, 2d DRJN, and PRJN.

---

### III.  FACTS

On December 31, 2019, China reported incidents of a pneumonia of unknown cause to the World Health Organization.[1]  Since then, that infectious disease, which came to be known as coronavirus disease 2019 ("COVID-19"), has swept the globe, infecting millions and killing over 470,000 thousand people.[2]  The United States has become the global epicenter for the spread of the illness, recording two million cases and over 120,000 deaths as a result of COVID-19.[3]  In California, over 183,000 people have tested positive for COVID-19 and approximately 5,500 people have died from the disease.[4]

On March 4, 2020, in preparation and response to the first emerging cases of COVID-19, Governor Newsom declared a state of emergency in California.  (See Exhibit 1.)  As COVID-19 accelerated its spread across California and the country, Newsom issued Executive Order N-33-20 ("First Order") on March 19, 2020.  (Exhibit 2.)  The First Order directed all California residents to remain in their homes except to travel to "essential critical infrastructure" jobs or shop for necessities.  (Id. at 12; Complaint ¶¶ 7, 24.)  It also ordered California residents to heed current and future directives by the State Public Health Officer until further notice.  (Exhibit 2 at 12.)

A public health order ("PHO") issued by State Health Officer Angell was incorporated within the First Order.  (Id.)  The PHO identified sixteen occupational industries defined by the United States Department of Homeland Security ("DHS") as "essential" for purposes of the First Order.  (Id.)  The PHO provided that California residents in those sixteen industries were permitted to "continue their work because of the importance of these sectors to Californians' health and well-being."  (Id. at 13.)  On March 22, 2020, shortly after the First Order was issued, Angell released a detailed directive enumerating which workers, vocations, and occupations were included in the essential workforce.[5]  (Complaint ¶¶ 20, 58(b.).)  Hotels and their employees were omitted from the list.

---

[1] World Health Organization, Coronavirus Disease 2019 Situation Report, June 23, 2020 https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4.

[2] John Hopkins University of Medicine, Covid-19 Global Cases Map, June 23, 2020 https://coronavirus.jhu.edu/map.html.

[3] Centers for Disease Control, Coronavirus Disease 2019 (COVID-19), June 23, 2020 https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[4] California Department of Public Health, COVID-19 By The Numbers, June 23, 2020 https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (last updated June 23, 2020.)

[5] COVID19.CA.GOV, Essential Workforce, June 16, 2020 https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf (the "List").

---

On May 4, 2020, Newsom issued Executive Order N-60-20 ("Second Order") and announced a transition to "Stage 2" of California's plan to reopen businesses and public activities. (See Exhibit 6.) The Second Order, among other things, directed Angell to establish criteria and procedures for local jurisdictions to implement less restrictive public health measures than those required by statewide public health directives. (Id. at 49.)

Three days later, Angell issued a second public health order ("Second PHO," and collectively with the First Order, Second Order, and PHO, "Orders") that offered guidance for counties to progressively reopen additional sectors of business on recommended dates. (Exhibit 7 at 53.) The guidance required that all industries and facilities encompassed by Stage 2 comply with five distinct health-based safeguards prior to reopening.[6] On June 5, 2020, the California Department of Health and Safety ("CDHS") provided guidance for reopening hotels, lodging, and short-term rentals. (See Exhibit 11.) The CDHS guidance recommends, but does not require, that hotels be reopened on June 12, 2020. (Id. at 90.) The guidance disclaims that it should be implemented only with the approval of the county health officer. (Id. at 89.)

 The Second PHO also sets forth procedures and criteria for local health jurisdictions to obtain countywide "variances" for certain industries and businesses. (Id. at 53–54.) County variances permit local health jurisdictions meeting certain epidemiological standards to reopen despite the statewide closures imposed by the Orders. (Id. at 54.) The variances are intended to reflect that counties with a low number of COVID-19 cases are capable of resuming business activities with less risk than counties with a high number of recorded cases. (Id.)

Plaintiff, operating under the name V Palm Springs Hotel, is a company that operates a 144-room hotel ("Hotel") located at 333 East Palm Canyon Drive, Palm Springs, California. (Complaint ¶ 17; Grossman Declaration ¶ 2.) Plaintiff has been forced to close its Hotel, cease operations, and terminate a majority of its employees as a result of the Orders. (Grossman Declaration ¶¶ 3, 5.) The Hotel maintains an open floor plan, has no elevators or enclosed hallways, and contains public spaces that are primarily outdoors. (Id. ¶ 4.)

## IV.  LEGAL STANDARD

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing may be held on the propriety of a preliminary injunction. See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); see Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy and Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2011).

---

[6] COVID19.CA.GOV, Statewide Industry Guidance to Reduce Risk, June 16, 2020 https://covid19.ca.gov/industry-guidance/.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The Ninth Circuit employs the "serious questions" test, which states "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). "A preliminary injunction is an 'extraordinary and drastic remedy.' It should never be awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citation omitted). When seeking a temporary restraining order through an ex parte application, a plaintiff must further show that he is without fault in creating the crisis necessitating the bypass of regular motion procedures. See Mission Power Eng'g Co. v. Cont'l Gas Co., 883 F. Supp. 488, 492–93 (C.D. Cal. 1995). The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury, Simula, Inc. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999), that must be imminent in nature, Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

## V. DISCUSSION

### A. Mootness

Defendants argue that Plaintiff's entire Application is moot because the Hotel is permitted to reopen under the CDHS's industry guidance. (Opposition at 16–17.) The Court disagrees. The Orders instruct all non-essential and non-designated businesses to shutter and cease operations. To be sure, CDHS guidance instructs businesses how to safely reopen hotels, lodging, and short-term rentals. (See Exhibit 11.) However, the guidance uses permissive and not mandatory language, providing a "recommended effective date" of June 12, 2020 and disclaiming that "guidance should be implemented only with county health officer approval following their review of local epidemiological data[.]" (Id. at 90.)

At the June 16, 2020 telephonic hearing, counsel for Defendants asserted that current guidance from the County of Riverside permits Plaintiff to immediately reopen the Hotel without prior approval. (Cf. Exhibit 13 at 5 (depicting County of Riverside press release stating that hotels are eligible to reopen on June 12, 2020).) However, even if true, Defendants admit that the Hotel would continue to be bound by State and county restrictions that include limits on capacity and other regular business operations. For example, both the statewide and county guidance still forbid Plaintiff from reopening certain areas of its Hotel.[7] (See Exhibit 11 at 91 (statewide guidance instructing hotel owners to keep certain meeting spaces closed even after reopening).) At the very least, Defendants' Orders continue to prevent Plaintiff from fully

---

[7] See Riverside County Business & Community Services, Safe Reopening Guidelines, June 23, 2020 https://rivcoccsd.org/reopening-guidelines (requiring Riverside County hotels to familiarize themselves with State Guidance, keep areas like meeting venues and banquet halls closed, and abide by a variety of other restrictions on operations).

---

**CIVIL MINUTES—GENERAL**                   Initials of Deputy Clerk MG

Exhibit 12
054

reopening the Hotel and immediately resuming normal operations unburdened by State and local restrictions. As a result, the Application presents an "actual, ongoing case[] or controvers[y]" and Plaintiff continues to "have a personal stake in the outcome" of the Application. Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477–78 (1990) (internal quotations omitted).

## B. Likelihood of Success on the Merits

Plaintiff brings claims challenging the constitutionality of Defendants' Orders to shutter and restrict non-essential businesses in the wake of COVID-19. (See Application.) Plaintiff requests that the Court enjoin enforcement of the Orders and permit Plaintiff's Hotel, a non-essential business, to resume normal operations. (Id.) In order to obtain a temporary restraining order, Plaintiff must at least establish a likelihood of success on the merits or the existence of "serious questions going to the merits." Cottrell, 632 F.3d at 1135 (internal quotations omitted). For reasons described below, the Court finds a temporary injunction unwarranted.

### 1. Jacobson and the Exercise of Executive Powers During State of Emergency

Plaintiff challenges the constitutionality of the emergency executive actions taken by Defendants to abate the spread of COVID-19. To establish serious questions regarding the constitutionality of the Orders, Plaintiff must do more than establish an infringement of its rights, for as this Court has previously explained, "Defendants have a right to protect California residents from the spread of COVID-19 — even if those protections temporarily burden constitutional rights to a greater degree than normally permissible." Gish v. Newsom, 2020 WL 1979970, at *4 (C.D. Cal. Apr. 23, 2020). Rather than being subject to normal constitutional analysis, Defendants' Orders warrant the deference necessary to reflect the principle that "[t]he legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases." Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 35 (1905).

In Gish, the Court found that Defendants' COVID-19 containment measures call for the more lenient standard of scrutiny first articulated by the Supreme Court a century ago in Jacobson: in times of public peril, responses to crisis that limit or suspend constitutional rights must only "[(1)] have a 'real or substantial relation' to the crisis and (2) must not represent 'plain, palpable' invasions of clearly protected rights." Gish, 2020 WL 1979970, at *5 (quoting Jacobson, 197 U.S. at 31). Since then, other federal courts across the country have also relied on Jacobson's relaxed scrutiny to analyze the constitutional validity of Defendants' Orders and similar emergency directives. See, e.g., Robinson v. Attorney General, 957 F.3d 1171, 1182–83 (11th Cir. 2020) (applying Jacobson); Altman v. Cty. of Santa Clara, 2020 WL 2850291, at *8 (N.D. Cal. June 2, 2020) (same); Antietam Battlefield KOA v. Hogan, 2020 WL 2556496, at *5 (D. Md. May 20, 2020) (same); Open Our Oregon v. Brown, 2020 WL 2542861, at *2 (D. Or. May 19, 2020) (same); Amato v. Elicker, 2020 WL 2542788, at *10 (D. Conn. May 19, 2020) (same); Calvary Chapel of Bangor v. Mills, 2020 WL 2310913, at *7 (D. Me. May 9, 2020) (same); Givens v. Newsom, 2020 WL 2307224, at *4 (E.D. Cal. May 8, 2020) (same); Cross Culture Christian Ctr. v. Newsom, 2020 WL 2121111, at *3 (E.D. Cal. May 5, 2020) (same); Cassell v. Snyders, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020) (same).

Chief Justice Roberts recently echoed this Court, its sister courts, and Jacobson in explaining the need for judicial deference to public health officials during a pandemic.  See S. Bay United Pentecostal Church v. Newsom, No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) (hereinafter "South Bay").  In South Bay, the Supreme Court denied an emergency request for injunctive relief from a group of church parishioners who alleged Defendants' Orders unconstitutionally prohibited them from gathering in-person to practice their religion.  Id.  In denying the parishioners relief, Chief Justice Roberts defended the broad discretion of the State to fashion responses to an epidemic and emphasized the federal judiciary's limited role in overseeing those responses:

> "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement.  Our Constitution principally entrusts [t]he safety and the health of the people to the politically accountable officials of the States to guard and protect.  When those officials undertake[ ] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.  Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people."

Id. (Roberts, C.J., concurring) (citing, among other cases, Jacobson, 197 U.S. at 38) (alterations in original) (internal citations and quotations omitted).

The reasons for applying Jacobson's relaxed constitutional scrutiny have only become more pressing since Gish and South Bay.  COVID-19 continues to ravage the country.  In California, confirmed cases of COVID-19 have risen to unprecedented levels.[8]  SARS-CoV-2, the strain of coronavirus that causes COVID-19, is equal parts insidious and ruthless.  The Court need not belabor that point: the virus's lethality, contagiousness, predisposition to linger on surfaces, and capacity to spread through presymptomatic and asymptomatic carriers are well-established.  Gish, 2020 WL 1979970, at *4.  Once infected with SARS-CoV-2, individuals who develop COVID-19 experience severe acute respiratory symptoms that can render breathing impossible.  For many, especially the elderly, handicapped, or chronically ill, COVID-19 is a death sentence.  As of the date of this Order, "there is no known cure, no effective treatment, and no vaccine."  South Bay, 2020 WL 2813056, at *1.  In times of great peril, the sovereign has the right — if not the obligation — to protect its people from danger.  We live in a time of great peril.

---

[8] Lisa Shumaker, *Record Spikes in New Coronavirus Cases, Hospitalizations Sweep Parts of U.S.*, REUTERS (June 14, 2020), https://www.reuters.com/article/us-health-coronavirus-usa/record-spikes-in-new-coronavirus-cases-hospitalizations-sweep-parts-of-u-s-idUSKBN23L0JB (last accessed June 16, 2020.)

And in times of great peril, <u>Jacobson</u> provides the relevant framework for constitutional analysis.  Applying <u>Jacobson</u> to the Orders, the Court finds that they easily survive constitutional scrutiny.  First, the Orders have a "substantial relation" to slowing the spread of COVID-19.  <u>Gish</u>, 2020 WL 1979970, at *5.  Defendants' Orders require residents of California to stay home and businesses to shutter to limit the public's movement and slow transmission of COVID-19.  To the extent the Orders permit work or movement, they are strategically designed to progressively reopen low-risk businesses and reallow low-risk activities — businesses and activities that, through increased sanitization measures and limited human contact, can resume without overwhelming the State's healthcare system.  (Watt Declaration ¶¶ 16–17.)  Second, the Orders are not "'plain, palpable' invasions of clearly protected rights."  <u>Id.</u>  As described below in more detail, the Orders do not invade Plaintiff's rights at all, let alone "plain[ly], palpabl[y]" invade them.  As a result, <u>Jacobson</u>, <u>Gish</u>, and other cases across the country counsel that Plaintiff likely cannot prevail on its claims.

## 2.  Constitutional Analyses

While Plaintiff has not shown a likelihood of success under the <u>Jacobson</u> test, in an abundance of caution, the Court individually considers each of Plaintiff's claims under traditional constitutional scrutiny.  In the Application, Plaintiff challenges the constitutionality of the Orders under four provisions of the United States and California Constitutions: (1) the Due Process Clause; (2) the Equal Protection Clause; (3) the Takings Clause; and (4) Article I of the California Constitution.  (<u>See</u> Application.)  The Court finds that even without the benefit of deference, the Orders are constitutionally valid.

### a.  Due Process and Equal Protection Claims

Plaintiff contends that the Orders violate its rights under the Due Process and Equal Protection Clauses of the United States Constitution.  (Memo at 15.)  In particular, Plaintiff surmises that the Orders are unconstitutional because they: (1) lack a rational basis; (2) were not prefaced by a fair hearing; and (3) are unconstitutionally vague.  The Court addresses each of Plaintiff's arguments in turn.

#### i.  Right to Labor and Right to Equal Protection of the Law

Plaintiff first contends that the Orders infringe on its right to pursue a profession under the Substantive Due Process Clause and its right to equal protection of the laws under the Equal Protection Clause.  (Memo at 15, 17–18.)  Both rights require the Court to examine whether Defendants' Orders lack a rational basis; if they do, they fail to withstand constitutional scrutiny.[9]

---

[9] The Court assumes without deciding that the right to engage in a chosen profession is implicated by the Orders.  But see <u>Guzman v. Shewry</u>, 552 F.3d 941, 954 (9th Cir. 2009) ("The Supreme Court has not defined the boundaries of an individual's right to pursue his chosen profession… however, [] all cases recognizing such a right have deal[t] with a *complete prohibition*

Angelotti Chiropractic, Inc. v. Baker, 791 F.3d 1075, 1085 (9th Cir. 2015) (applying rational basis scrutiny for Equal Protection claim); see also Enquist v. Oregon Dep't of Agric., 478 F.3d 985, 997 (9th Cir. 2007) (applying rational basis scrutiny for right to pursue a profession).

Under rational basis review, "legislation that does not draw a distinction along suspect lines such as race or gender passes muster… as long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Baker, 791 F.3d at 1085. Plaintiff asserts that "[n]o rational reason [exists] for singling out Plaintiff's business activities" and that there is "no rational reason to continue to ban Plaintiff from the use of its business property." (Memo at 15–16.) Plaintiff avers that it is irrational to permit "retailers such as Costco, chain drugstores, and larger grocery stores" to work with few restrictions, while Plaintiff and other hotels cannot reopen their businesses under any circumstance.[10] (Id. at 16.)

But the products sold by those retailers — food, medicine, and other essential goods — are, unlike a room in a hotel, necessary to sustain life. More importantly, Plaintiff ignores that in the context of COVID-19, the hotel industry presents unique dangers to patrons and employees. Unlike commercial activity in the retail, restaurant, pharmaceutical, and cosmetic industries, the operation of a hotel creates two unavoidable perils: (1) hotels attract — and indeed are designed to attract — tourism from across the geographic spectrum; and (2) hotels necessarily implicate the extended use of indoor and shared facilities.

As to the first peril, even Plaintiff has recognized that "[t]ourism is… an enormous economic driver in the Coachella Valley and the City of Palm Springs in particular" and that the Hotel is "in the heart of Palm Springs, which is a popular location for tourism." (Memo at 15, 17 (internal quotations omitted); see also Exhibit D (letter from the City of Palm Springs to Defendants describing the City's reliance on leisure travel and tourism).) When reopened, Plaintiff's Hotel will likely attract visitors from across the state and the country. Patrons of the Hotel might include individuals from cities, states, and countries where COVID-19 runs rampant, threatening the health and safety of the City of Palm Springs, the County of Riverside, and the state of California. In a health response necessarily centered on limiting and tracing individuals' movement to avoid uncontrolled transmission of a contagious disease, businesses that encourage leisure travel are anathema to public welfare.

The risk of attracting geographically diverse patronage is only enhanced by the inherently communal and indoor nature of hotels. The Court recognizes, as Plaintiff points out, that some

---

on the right to engage in a calling, and not [a] sort of brief interruption.") (internal citations and quotations omitted) (emphasis in original).

[10] Plaintiff also critiques the County of Riverside's decision to obtain a variance to permit shopping centers, dine-in restaurants, and short-term vacation rentals to reopen prior to hotels. (Memo at 9.) Plaintiff cannot, however, rely on local decisions by the County of Riverside to establish the irrationality of the State's Orders — particularly when the County of Riverside and its officials are not parties to this matter.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

Exhibit 12
058

amenities offered by hotels can mitigate the dangers of COVID-19 by instituting social-distancing requirements and shifting some services outdoors. However, Plaintiff's business does not sell outdoor amenities — it sells indoor lodging. The defining service offered by hotels is the temporary rental of a room and a license to utilize the property as shelter for a definite period of time. Guests purchase "nights" and "rooms" at a hotel. Instead of briefly remaining on the premises for a few minutes or hours, customers stay for a set number of days or weeks. They make use of shared indoor facilities, restrooms, and bedrooms. When their license expires, new guests at the hotel replace them, and occupy the same indoor facilities, restrooms, and bedrooms for an additional period of time. At once, hundreds if not thousands of individuals can reside on the premises of a hotel. Over weeks and months, tens of thousands will come and go, sleeping in the same beds, using the same bathrooms, and physically touching the same furniture and appliances. Patrons of the hotel will bring with them luggage, clothes, personal possessions, and, possibly, COVID-19. This "reasonably conceivable" state of facts gives Defendants a rational basis to shutter and restrict California's hotels. Baker, 791 F.3d at 1085.

In response to the apparent dangers above, Plaintiff offers three reasons why the Orders are unnecessary and arbitrary methods of slowing the spread of COVID-19. None are convincing. First, Plaintiff argues that the Orders are unnecessary and irrational because Palm Springs has very few active COVID-19 cases and deaths. That argument, however, plainly fails to recognize the "possibility that [COVID-19] numbers are lower *because* of the Stay-at-Home Order[s]." Six v. Newsom, 2020 WL 2896543, at *4 (C.D. Cal. May 22, 2020) (emphasis in original). Furthermore, as this Court has already recognized, "because asymptomatic and pre-symptomatic carriers of the virus can infect others, a belief that one… has never been in close proximity to any locality where [] coronavirus has… existed is largely meaningless." Gish, 2020 WL 1979970, at *4 (internal quotations omitted). While Palm Springs has controlled the spread of COVID-19, its home is Riverside County, the county with the second highest number of COVID-19 cases in California, and abuts Los Angeles County, the county with the most COVID-19 cases.[11] The risk that intra or intercounty travel may spread the disease to Palm Springs is, on its own, a rational basis for the Orders.

Second, Plaintiff argued for the first time during the hearing that Newsom's failure to enforce the Orders against individuals gathering across California to protest racial injustice establishes the Orders' arbitrariness. But a law is not arbitrary merely because it is <u>enforced</u> arbitrarily. To the extent Plaintiff seeks to transform its rational basis claim into a claim for arbitrary enforcement, it fares no better. "Selective enforcement of valid laws, without more, does not make [] [D]efendants' action[s] irrational." Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th Cir. 1995). Instead, Plaintiff must establish that Defendants' alleged selective enforcement of the Orders is "malicious, irrational or plainly arbitrary." Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004) (internal quotations omitted). As the Court alluded to at the hearing, enforcement of the Orders against thousands of gathered protestors

---

[11] *California Coronavirus Map and Case Count*, N.Y. TIMES (June 23, 2020), https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (last accessed June 23, 2020.)

presents serious public safety concerns that overcome otherwise valid considerations of public health. Moreover, refusing to enforce the Orders against the protestors is rational for another reason: it is arguably consistent with the Orders' intended purpose. Mass enforcement of the Orders could entail significant person-to-person physical contact and the collective detention of large groups of individuals, providing a logically consistent reason to refuse to enforce the Orders against protestors. Plaintiff therefore likely cannot establish that Defendants' allegedly selective enforcement of the Orders is "malicious, irrational or plainly arbitrary." Goldberg, 374 F.3d at 944.

Third, Plaintiff cites the plainly distinguishable case of Ex parte Jentzsch, 112 Cal. 468 (1896) to urge the Court to enjoin enforcement of the Orders. In Jentzsch, the California Supreme Court addressed a petition for habeas corpus from a prisoner who had been jailed for violating a law prohibiting barbers from working on Sundays or legal holidays after 12:00 p.m. Id. at 470-471. The court granted the habeas petition and held that the arbitrary and irrational nature of the prohibition violated several provisions of the California Constitution. Id. at 471. The court found that the law was unconstitutionally arbitrary because it limited the working hours of barbers to discourage abusive labor practices, yet inexplicably did not apply to any other vocation. Id. at 474. As the court went on to explain,

> "There must be back of that a substantial reason why [a law] is made to operate only upon a class, and not generally upon all… although a law is general and constitutional when it applies equally to all persons embraced in a class founded upon some natural or intrinsic or constitutional distinction, it is not general or constitutional if it confers particular privileges or imposes peculiar disabilities or burdensome conditions in the exercise of a common right upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law…. [I]n a law such as this, no reason has been or can be shown why the followers of one useful and unobjectionable employment should be debarred from the right to labor upon certain days, and others in like classes of employment be not so debarred.

Id. at 474-475.

Setting aside distinctions between federal and state constitutional law, Jentzsch is inapposite. Unlike the barber in Jentzsch, Plaintiff cannot contend that it is within "a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law." Id. at 474. As detailed above, Plaintiff and other hotel businesses attract large gatherings of travelers from across the state and country and could serve as a lethal vector for the spread of COVID-19. Unlike other occupations and businesses which might rarely or inconsistently invite individuals from outside their communities, hotels expect and rely on patronization from curious travelers and tourists from all parts of the world — parts of the world which might be observing dramatic increases in confirmed cases of COVID-19. Far from providing "no reason" why Plaintiff should be barred from its "right to labor," Defendants have provided perhaps the most compelling reason of all: saving lives. Id. at 475. The Court therefore finds that Plaintiff likely cannot establish that the Orders lack a rational basis.

### ii.    Right to a Hearing

Second, Plaintiff suggests that the Orders unconstitutionally deprived it of property without a fair hearing.  (Memo at 16.)  To be sure, "[o]rdinarily, due process of law requires an opportunity for some kind of hearing prior to the deprivation of a significant property interest." Samson v. City of Bainbridge Island, 683 F.3d 1051, 1060 (9th Cir. 2012).  But "'[w]hen the action complained of is legislative in nature, due process is satisfied when the [governmental] body performs its responsibilities in the normal manner prescribed by law.'"  Id. (quoting Halverson v. Skagit Cty., 42 F.3d 1257, 1260 (9th Cir. 1994), as amended on denial of reh'g (Feb. 9, 1995)).  Governmental actions are "legislative in nature" when the actions "affect large areas and are not directed at one or a few individuals[.]"  Halverson, 42 F.3d at 1261.  Here, the Orders issued by Defendants affect all citizens of California and at their most particular direct restrictions towards nationwide groups and classes of individuals and businesses.  Moreover, Plaintiff does not contend that Defendants failed to issue the Orders "in the normal manner prescribed by law."[12]  Halverson, 42 F.3d at 1260.  As a result, Plaintiff's procedural due process theory is unlikely to succeed on the merits.  See Six, 2020 WL 2896543, at *8 (citing Halverson and finding identical contention by plaintiffs unlikely to succeed on the merits).

### iii.    Vagueness

Finally, Plaintiff argues that the Orders are void for vagueness because "persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" (Memo at 16 (quoting Connally v. General Const. Co., 269 U.S. 385, 391 (1926)).)  However, aside from general complaints about the application of the Orders to its business, Plaintiff fails to specify which provisions in the Orders are unconstitutionally vague.  As far as the Court can decipher, Plaintiff appears to take issue with the Orders' definition for "essential" and "non-essential" businesses.  (Id. at 17.)

To the extent Plaintiff argues that the Orders' use of "essential" or "non-essential" is unconstitutionally vague, the Court disagrees.  A law or executive order is impermissibly vague only if it "[1] fails to provide a reasonable opportunity to know what conduct is prohibited, or [2] is so indefinite as to allow arbitrary and discriminatory enforcement."  Arce v. Douglas, 793 F.3d 968, 988 (9th Cir. 2015).  As to the first prong, "[d]ue process does not require impossible standards of clarity."  Id. (citing Kolender v. Lawson, 461 U.S. 352, 361 (1983)) (internal quotations omitted).  Instead, "[t]ypically, all that is required to satisfy [] due process concern[s] is 'fair notice' of the conduct a statute proscribes."  Edge v. City of Everett, 929 F.3d 657, 664 (9th Cir. 2019), cert. denied sub nom. Edge v. City of Everett, Washington, 140 S. Ct. 1297 (2020).  As to the second prong, the Court must ask whether the Orders are "amenable to

---

[12] Plaintiff fleetingly remarks that Angell "unilaterally designated a list of 'essential critical infrastructure workers' without going through any rulemaking procedures."  (Memo at 8.)  Even if Plaintiff is correct, it is the procedural invalidity of Newsom's orders incorporating the list— not Angell's PHOs — that Plaintiff must demonstrate to establish a likelihood of success on the merits.

---

**CIVIL MINUTES—GENERAL**

Exhibit 12
061

unchecked law enforcement discretion." Id. at 665 (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 169–70 (1972)). Under the second prong of the analysis, "[d]efinitions of proscribed conduct that rest wholly or principally on the subjective viewpoint of a law enforcement officer" are constitutionally suspect. Id. at 666.

Here, the Orders clearly define occupations and businesses that are "non-essential" and "essential" and provide examples in each industry. In fact, Defendants have released a publicly available list of occupations, businesses, and workers permitted to work under the Orders. (See generally List.) The List is comprehensive, detailed, and leaves little room for interpretation. To the extent it causes confusion or lingering doubt, additional public resources provide specific answers to questions like "what's open statewide?" and "what's closed statewide?" (Exhibit 9 at 66–67.) Altogether, the particularity of Defendants' Orders, List, and public guidance is sufficient to "give a person of ordinary intelligence a reasonable opportunity to know what is prohibited[.]" Hunt v. City of Los Angeles, 638 F.3d 703, 712 (9th Cir. 2011). Indeed, Plaintiff itself has understood the Orders' definitions of essential and non-essential businesses as they apply to its Hotel, as evidenced by its ongoing compliance. Lastly, the explicit enumeration of occupations in the List leaves little room for the exercise of discretion — meaning that enforcement of the Orders does not "rest wholly or principally on the subjective viewpoint of a law enforcement officer[.]" Edge, 929 F.3d at 666. Plaintiff's vagueness theory is therefore unlikely to succeed on the merits.

### b. Takings Claim

#### i. Per Se Taking

Plaintiff contends that the Orders violate the Takings Clause of the United States Constitution. (Memo at 19.) In support of its argument, Plaintiff asserts that the Orders constitute a "complete and total regulatory and physical taking" of Plaintiff's property. (Id.) Plaintiff's argument is presumably a reference to Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992). In Lucas, the Supreme Court held that regulations that leave property owners with "no economically viable use" of their property constitute a per se taking. Lucas, 505 U.S. at 1020. The rule articulated in Lucas, however, applies only "to regulations that completely deprive an owner of all economically beneficial us[e] of her property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538 (2005) (emphasis in original) (internal quotations omitted). A Lucas taking is a "'relatively narrow' and relatively rare taking category[] confined to the 'extraordinary circumstance when no productive or economically beneficial use of land is permitted[.]'" Bridge Aina Le'a, LLC v. Land Use Comm'n, 950 F.3d 610, 625–26 (9th Cir. 2020) (quoting Lingle, 544 U.S. at 538 and Lucas, 505 U.S. at 1017) (emphasis in original) (internal citations omitted).

Clearly, Plaintiff retains some productive or economically beneficial use of its property. While Plaintiff may not be permitted to reopen its Hotel for normal business, the Orders permit it to use its property in a number of other ways. Plaintiff is free, for example, to sell food or beverages on the premises and engage in commercial construction or development of the Hotel. (List at 6, 22.) Furthermore, if Defendants are correct that Plaintiff may immediately reopen on a limited basis, Plaintiff can resume partial commercial lodging on the premises. Even if Plaintiff

---

could establish that the Orders prohibited "*all* economically beneficial us[e]" of its property, Lingle, 544 U.S. at 538, a temporary moratorium on all beneficial use of one's property is not a taking so long as it is reasonable. See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302 (2002) (holding that temporary ban on property development for 32 months did not constitute per se taking under Lucas). As described above, the Orders are rational and reasonable. Thus, Plaintiff likely cannot establish that the Orders constitute a per se taking.

> ### ii. Regulatory Taking

Alternatively, Plaintiff argues that the Penn Central factors weigh in favor of finding a regulatory taking. (Memo at 19 (citing Penn Central Trans. Co. v. City of New York, 438 U.S. 104, 124 (1978)).) The three Penn Central factors courts weigh to determine the occurrence of a regulatory taking include: "(1) [t]he economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." Bridge Aina Le'a, 950 F.3d at 625 (citing Penn Central, 438 U.S. at 124) (internal quotations omitted).

As to the first two factors, Plaintiff submits no evidence — whether it be expert opinion, documentary records of lost profits, or testimonial declarations — to establish the nature and extent of the Orders' "economic impact" or "interfere[nce] with [its] distinct investment-backed expectations[.]" Id. For that reason alone, Plaintiff cannot establish a likelihood of success on its regulatory takings claim. Garneau v. City of Seattle, 147 F.3d 802, 808 (9th Cir. 1998) (finding absence of evidence of the economic impact of regulation on plaintiffs' property "dispositive" and fatal to their takings claim).

To the extent Plaintiff could provide evidence of lost profits or interference with investment-backed expectations, the character of the government action at issue would likely outweigh either factor. Penn Central explained that regulations, statutes, and ordinances that merely "adjust[] the benefits and burdens of economic life to promote the common good" rather than enact a "physical invasion" of property rarely constitute a taking. Penn Central, 438 U.S. at 124. Similarly, a parallel line of long-standing authority has interpreted the Takings Clause to permit the outright destruction of property so long as the government is acting to abate an imminent threat to the public welfare. See United States v. Caltex, 334 U.S. 149, 154 (1952) ("[I]n times of imminent peril — such as when fire threatened a whole community — the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved."); see also Miller v. Schoene, 276 U.S. 272, 279–80 (1928) ("[W]here the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property.").

Here, Defendants' Orders are quintessential examples of regulations that "adjust[] the benefits and burdens of economic life to promote the common good[.]" Penn Central, 438 U.S. at 124. In essence, the Orders convert public health burdens into economic burdens, and reflect a judgment that the common good is best promoted by the protection of vulnerable members of

Exhibit 12
063

society from a lethal and contagious disease, rather than the protection of some proprietary interests.  Furthermore, Plaintiff does not, and cannot, contest that the Orders enact a "physical invasion" of its property.  Id.  To the extent the Orders temporarily deprive Plaintiff of the use and benefit of its Hotel, the Takings Clause is indifferent.  The State is entitled to prioritize the health of the public over the property rights of the individual.  Caltex, 334 U.S. at 154; see also Sederquist v. City of Tiburon, 765 F.2d 756, 761 (9th Cir. 1984) ("An ordinance may lawfully prohibit the best and most beneficial use of one's property.  In fact, land use regulations that have destroyed or adversely affected recognized real property interests have been upheld.") (internal citations and quotations omitted).  Plaintiff's regulatory takings claim is not likely to prevail on the merits.

### c.  Article I, Section 1 of the California Constitution

Plaintiff's last basis[13] for challenging the validity of the Orders is Article I, Section 1 of the California Constitution.  (Memo at 20.)  Plaintiff asserts that the California Constitution protects its right to "engage in the vocation of [its] choosing[.]"  (Id.)  In support of its argument, Plaintiff cites to a trio of California cases striking down various quarantine orders promulgated to limit the spread of infectious diseases.  (Id. at 20–21.)

Plaintiff's final claim is unlikely to succeed on the merits for three reasons.  First, federal courts are prohibited by the Eleventh Amendment from relying on state law to enjoin state officials.  Pennhurst, 465 U.S. at 106; see also Six, 2020 WL 2896543, at *8 (holding that Pennhurst warranted denial of state law claims in request for temporary restraining order).  Plaintiff's California Constitution claim is thus likely barred by state sovereign immunity.

Second, even if Defendants are not immune, Plaintiff's claim fails on its merits.  The guarantees in Article I, Section 1 of the California Constitution "are not absolute and do not operate as a curtailment on the basic power of the Legislature to enact reasonable police regulations."  Nat'l Org. for Reform of Marijuana Laws v. Gain, 100 Cal. App. 3d 586, 598 (1979); see also Chiyoko Ikuta v. Shunji K. Ikuta, 97 Cal. App. 2d 787, 789 (1950) ("The rights to enjoy liberty, to acquire, possess and protect property, which are secured to the individual by section 1, are not absolute but are circumscribed by the requirements of the public good.") (internal quotations omitted).  As detailed above, the Orders are reasonable and rational regulations designed to protect the public welfare.  As a result, they are not prohibited by Article I, Section 1 of the California Constitution.

---

[13] In the Complaint, Plaintiff alleges violations of other provisions of the California Constitution.  (See generally Complaint.)  Because Plaintiff does not reference those claims in the Application, the Court does not address them in this Order.  However, even if Plaintiff sought relief based on those claims, it would still not obtain the relief it seeks.  As explained below, Plaintiff cannot obtain federal "[injunctive] relief against state officials on the basis of state law."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984).

---

**CIVIL MINUTES—GENERAL**

Exhibit 12
064

Third, and last, all three cases cited by Plaintiff to support its claim are distinguishable.  In Ex parte Martin, 83 Cal. App. 2d 164 (1948) and Ex parte Arata, 52 Cal. App. 380 (1921), two California Courts of Appeals held that the quarantine of individuals suspected of infection with a venereal disease required individualized "probable cause."  Ex parte Martin, 83 Cal. App. 2d at 167; Ex parte Arata, 52 Cal. App. at 380.  In both cases, however, the individuals were imprisoned in a local jail or prison, not ordered to quarantine at home.  Ex parte Martin, 83 Cal. App. 2d at 165; Ex Parte Arata, 52 Cal. App. at 381.  Moreover, the venereal disease at issue in both matters posed dramatically different public health risks than a respiratory disease that can unwittingly spread through asymptomatic or presymptomatic transmission.  In the case of the latter, detection is sometimes impossible, and "[r]equiring public health officials in the current pandemic to identify specific individuals who carry the virus and order only them to stay home would not be feasible."  Best Supplement Guide, LLC, 2020 WL 2615022, at *7 (internal quotations omitted).

The other case cited by Plaintiff, Jew Ho v. Williamson, 103 F. 10 (C.C. N.D. Cal. 1900), is also inapposite.  In Jew Ho, San Francisco imposed an intramunicipal quarantine in response to the bubonic plague that encompassed the blocks surrounding the city's Chinatown.  Jew Ho, 103 F. at 12.  The court struck down the quarantine as unconstitutionally irrational and noted that the quarantine "[did] not restrict intercommunication within the quarantined district…. [People] are permitted to go from a place where it is said that the disease has appeared, freely among the other 10,000 people in that district."  Id. at 22.  It further explained that the quarantine's failure to limit travel within the quarantined district counterproductively increased the risk of bubonic plague transmission in the district.  Id. at 22–23.  The quarantine was also found to be strategically tailored to impermissibly "discriminate[] against the Chinese population of this city, [] in favor of the people of other races."  Id. at 23.  Finally, although the court did not rule on the sufficiency of the evidence, it noted that the facts suggested that "the bubonic plague has not existed, and does not now exist, in San Francisco."  Id. at 26.  Thus, unlike here, Jew Ho dealt with a discriminatory, arbitrary, and counterproductive quarantine enacted in response to a seemingly illusory public health threat.  Accordingly, Plaintiff has failed to cite any persuasive authority, and cannot establish a likelihood of success on the merits of its California Constitution claim.

## C.  Remaining Factors

Plaintiff cannot show a likelihood of success or raise serious questions about the merits of its claim.  Plaintiff's failure is fatal to its request for a temporary restraining order.  See Best Supplement Guide, LLC, 2020 WL 2615022, at *7 ("A district court may not grant a plaintiff's motion for a temporary restraining order if the request fails to show the plaintiff is likely to succeed on the merits of a claim or, at least, raises serious questions going to the merits of that claim.") (citing Winter, 555 U.S. at 20).  As a result, Plaintiff has not established its entitlement to the injunctive relief requested.

In one respect, the Court agrees with Plaintiff: "[t]his emergency is unlike any in our nation's history."  (Memo at 17.)  Among other things, citizens have been abruptly asked to physically isolate, alter religious practices, refrain from participation in protests and large

gatherings, abandon social groups, avoid their relatives and loved ones, limit travel, wear facemasks, and — as in Plaintiff's case — sacrifice economically to stem the spread of COVID-19. The Court is sympathetic to Plaintiff and all those impacted by the current pandemic.

But while the Court holds sympathy for Plaintiff and others, Defendants are permitted to take temporary action to protect their constituents from an uncontrolled, fatal, and highly infectious disease. In the span of just three months, COVID-19 has killed over 120,000 people in the United States. Hundreds more die by the day. Defendants' Orders are a reasonable and rational effort to shield California residents from a lethal threat; the rights guaranteed by the Constitution are meaningless if nobody remains to enjoy them. Plaintiff's Application is DENIED.

## VI.  CONCLUSION

For the reasons described above, the Court DENIES Plaintiff's Application.


**IT IS SO ORDERED.**

**CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk MG

Exhibit 12
066